LAFAYETTE PLACE ASSOCIATES *vs.* BOSTON REDEVELOPMENT AUTHORITY & another.[1]

Suffolk. March 9, 1998. - May 20, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Contract,* What constitutes, Construction of contract, Performance and breach. *Boston. Redevelopment Authority. Municipal Corporations,* Contracts. *Governmental Immunity. Massachusetts Tort Claims Act. Consumer Protection Act,* Unfair or deceptive act, Trade or commerce.

The terms of an agreement, as amended, between the city of Boston, the Boston Redevelopment Authority, and a developer were sufficiently definite to constitute a valid and enforceable contract [517-519], however, where a bilateral contract for the purchase and sale of a certain parcel of real estate arose upon the developer's exercise of an option under the agreement and where, thereafter, neither the developer nor the city tendered performance, neither party was in breach or default of the agreement, which then expired by its own terms [519-527].

In a civil action, the judge did not abuse his discretion in ruling that the Boston Redevelopment Authority had timely raised the defense of immunity under the Massachusetts Tort Claims Act, G. L. c. 258, § 10 (*c*). [527-528]

This court concluded that the Boston Redevelopment Authority is a public employer under the Massachusetts Tort Claims Act, and, as such, the provisions of G. L. c. 258, § 10 (*c*), confer upon it immunity from liability for intentional torts. [528-535]

In a G. L. c. 93A claim brought by a developer against the city of Boston and the Boston Redevelopment Authority, the judge correctly allowed the defendants' motion for summary judgment where the defendants' transactions with the plaintiff were wholly in pursuit of the legislatively prescribed redevelopment mandate of G. L. c. 121A, § 2, and did not constitute "trade or commerce." [535-536]

CIVIL ACTION commenced in the Superior Court Department on March 16, 1992.

A motion for summary judgment was heard by *Hiller B. Zobel,* J., and the case was tried before *Robert A. Mulligan,* J.

The Supreme Judicial Court granted an application for direct appellate review.

---

[1]City of Boston.

*Stephen H. Oleskey (Lisa J. Pirozzolo* with him) for the plaintiff.

*Saul A. Schapiro (Nina F. Lempert* with him) for Boston Redevelopment Authority.

*Rory FitzPatrick (Irene C. Freidel & Merita Hopkins* with him) for the city of Boston.

FRIED, J. A jury found the defendants, the city of Boston (city) and the Boston Redevelopment Authority (BRA), liable for monetary damages for having breached a contract with the plaintiff, Lafayette Place Associates (LPA), for the sale of certain land (Hayward Parcel), and the BRA liable for the tort of intentional interference with LPA's contractual relation with another entity, Campeau Massachusetts, Inc. (Campeau). The trial judge entered judgment against the city, and granted judgment notwithstanding the verdict in favor of the BRA, on the ground that it was not amenable to suit for an intentional tort. We conclude that there was a valid contract between the city and LPA but that the city did not breach it. We also affirm the judgment entered in favor of the BRA, and the dismissal of LPA's claims under G. L. c. 93A.

I

This dispute arises out of efforts going back to the administration of Boston Mayor Kevin White in the late 1970's to rehabilitate the "Combat Zone," a dilapidated area adjacent to a shopping area on Washington Street. A grand scheme was devised by LPA's entrepreneurs for the construction of a department store, a retail mall, and a hotel in the area. In 1978, an agreement (Tripartite Agreement) was signed between LPA, the city, and the BRA for the development of the area in two phases. Phase I was to encompass a shopping mall and a hotel and was eventually built.[2] It is not a subject of these suits. Phase II was to include one or more office buildings, further retail space, and a department store. It was to be built on four parcels of land to be assembled into a single parcel, called the Hayward Parcel, at the time partially occupied by a city parking structure, the Hayward Place parking garage. Whether Phase II would ever be undertaken was made contingent in the Tripartite Agreement on

---

[2]The shopping mall, Lafayette Place Mall, was not a success. The bank that held the mortgage foreclosed on it on February 5, 1991. The hotel, originally known as the Lafayette Hotel, has been operating successfully as the Swissôtel and separated itself from the development.

the city's decision to remove the parking structure. If it did, the city would still be allowed to build an underground parking garage on the site with LPA being granted air rights to build over it.

The agreement as to the development of the Hayward Parcel was principally set out in Section 6.02 of the Tripartite Agreement. Section 6.02 is expressed in terms of the grant of an option to LPA to purchase the Hayward Parcel. The option is contingent on notice by the city that it plans to discontinue the Hayward Place garage. By agreement, LPA could thereupon notify the city within the option period if it "desires to purchase the rights hereby made available to it [and] the City shall sell the same . . . ." The Tripartite Agreement and accompanying maps identify the boundaries of the Hayward Parcel, but indicate several alternatives concerning the rights to be conveyed. In the Tripartite Agreement, the city is stated to have in hand appraisals of the fair market value of two of the four component parcels of the Hayward Parcel, and agrees "forthwith" to obtain appraisals of the two remaining parcels.[3] The price to be paid was to be one-half of the appraised fair market value as of 1978, plus one-half of the increase in value attributable to "the construction of the Public Improvements and the Project."[4] In other words, the formula accounted for the possibility that between 1978 and the future sale of the Hayward Parcel, the value of the parcel could change as a result of the construction of Phase I on adjacent land. The Tripartite Agreement further provided that "[t]he existence and amount of increase in fair market values attributable to the construction of the Public Improvements and the Project shall be determined by independent appraisal." Section 13.01 of the Tripartite Agreement also provides, after giving a standard definition of fair market value, that such value shall be determined by a procedure, akin to arbitration, by which by giving written notice either party may designate a first appraiser, the other party may designate a second appraiser, and a third appraiser may be appointed by the first and second, by the Chief Judge of the United States District Court

---

[3]The city completed an appraisal of the third parcel in 1979.

[4]This was the formula to be used if the city ultimately determined, as it in fact did, that it would retain subsurface rights to build a parking garage under the Hayward Parcel. Had the city decided not to retain subsurface rights, an alternate formula provided that the purchase price would be the full fair market value as of 1978 plus one-half of any increase in value attributable to the construction of "the Public Improvements and the Project."

for the District of Massachusetts, or by the president of the Boston Bar Association.[5]

The Tripartite Agreement also provides,

> "[t]he Developer may exercise the right and option set forth in this Section 6.02 by giving notice of its desire to purchase such rights to the City at any time within the Option Period. After the receipt of and following such notice from the Developer, the parties shall in good faith negotiate and enter into an agreement calling for the purchase and sale of the rights in question. Such agreement shall be in the customary form of agreements for the purchase and sale of real estate in the greater Boston area except that the agreement shall reflect such reservation and shall contain other appropriate provisions with respect to the integration of construction and other matters relevant to coordinated use of the rights conveyed and the rights retained by the City."

On February 26, 1982, the parties agreed, in what is known as the Second Supplemental Agreement, to certain changes to the Tripartite Agreement concerning the construction and operation of a parking garage by the city under the Hayward Parcel. In addition, the parties amended Section 6.02 by adding the following:

> "[I]f the Developer shall exercise the right and option set forth in this Section 6.02, there shall automatically be created an agreement by the Developer to buy and by the City to sell the . . . Parcels . . . . [A]ppropriate details of the purchase and sale shall be worked out by the parties so as to conform to their intent under this Section 6.02., but if they shall be unable to do so then the matter shall be resolved by arbitration in accordance with the arbitration procedure set forth in ARTICLE EIGHT of the Deed and Agreement, dated as of September 11, 1979, between the City and the Developer."

Article 8 of the deed sets out a binding arbitration procedure for

[5]This appraisal process was to be used to determine the fair market value of the "project rights," which included the "Developer's present and future rights in and to the Project Area." The "project area" included parcels D-1, D-2, D-3, and D-4, which made up the Hayward Parcel.

the resolution of disputes.[6] On December 16, 1983, the city gave notice to LPA that it intended to discontinue the Hayward Place garage and build a parking garage beneath the Hayward Parcel, thereby commencing LPA's option period. In that notice, the city listed five contingencies to closing the sale of the Hayward Parcel, including that "the parties are able to agree, via appraisals, on the increased value of parcels D-1, D-2 and D-3, as the result of the construction of the Lafayette Place Project."

On July 2, 1986, as all parties agree, LPA exercised its option to purchase the Hayward Parcel. On October 27, 1987, the parties extended the date on which closing might take place by providing, in what is known as the Third Supplemental Agreement, that:

> "Section 6.02 of the Tripartite Agreement is amended by deleting the proviso in the fourth full paragraph thereof . . . and substituting in its place the following: 'provided that, unless the City and the Developer shall agree to a further extension, the Developer shall lose its rights hereunder to proceed with an acquisition if a closing has not occurred by January 1, 1989, unless the City and/or the Authority shall fail to work in good faith with the Developer through the design review process to conclude a closing.' "

By virtue of the Third Supplemental Agreement, LPA had until January 1, 1989, a date which all parties refer to as the "drop dead date," to "proceed with an acquisition."

LPA never demanded and the city never tendered a deed within the required time period or at any other time. The basis of its contract action against the city is that the city in bad faith failed to carry out those of its obligations under the Tripartite Agreement necessary to allow LPA to proceed to demand a closing, and indeed that it engaged in bad faith actions designed to impede LPA in effecting a timely closing. The reason for these obstructionist tactics by the city, as LPA sought to show by testimony and documents, was that the new administration

---

[6]The September 11, 1979 deed, which was for the purchase of the "Lafayette Parcel" in connection with Phase I, provides that "[i]f a dispute shall arise . . . and if . . . such dispute is to be settled by arbitration, then either Owner may serve upon the other Owner a notice demanding that the dispute be arbitrated . . . ." Each party is permitted to select an arbitrator, and the two chosen arbitrators then select a third.

of Mayor Raymond Flynn believed that the price established by the Section 6.02 formula, which was based on 1978 values, was grossly unfair to the city in the light of a strong surge in real estate prices in the intervening years. LPA offered evidence of several instances of what it claimed were the city's obstructionist tactics. These included failing to complete the appraisals necessary to establish the price for the Hayward Parcel, initiating zoning changes that would have greatly reduced the allowable height of the office towers planned for the site, lack of cooperation about determining whether Avenue de Lafayette and New Essex Street would be closed, and threatening to put a new street through the middle of the parcel, which would have made its development economically unviable.

In November, 1987, after the conclusion of the Third Supplemental Agreement but before the final breakdown of dealings in 1989, LPA negotiated the sale of its development rights in the Hayward Parcel to Campeau. LPA was to receive $24.5 million in return for its rights under Phase I of the project. The sale was subject to approval by the BRA, and on December 4, 1987, LPA filed an application for approval. On February 1, 1988, LPA withdrew its application; the BRA had not acted on it in the interim. In March, 1988, LPA entered into a lease agreement with Campeau whereby Campeau assumed LPA's debts under Phase I and was to pay LPA approximately $21.5 million in cash and notes in return for LPA's rights to the project. Under the lease agreement, Campeau agreed to pay LPA additional consideration if the BRA approved the sale of the Hayward Parcel.

Thereafter, LPA was not directly involved in negotiations regarding the sale of the Hayward Parcel. Campeau began elaborate plans for a development called "Boston Crossing," which included construction of a department store and office tower on the Hayward Parcel, the rebuilding of the Phase I mall on its nearby parcel, and the construction of an office tower above a rebuilt Jordan Marsh. During 1988, representatives from Campeau and the BRA met repeatedly to negotiate about Campeau's plans. When it became clear that Campeau could not secure BRA approval for the Boston Crossing project by the expiration of LPA's option period, Campeau requested a further extension of the drop dead date. The BRA refused to extend the January 1, 1989, deadline. On December 19, 1988, Campeau's president sent a letter to Mayor Flynn describing the current

state of the project, renewing Campeau's request for an extension of the option period, and informing Mayor Flynn that "we have no recourse but to officially notify the city that we wish to complete the transaction and make payment immediately." On December 30, 1988, Stephen Coyle, director of the BRA, responded. He stated that, "once the development review process is complete, the City's parcel can be sold for its fair reuse value," and noted that "[b]y their own terms, prior agreements on Hayward Place will expire on January 1, 1989. This event does not in our judgment alter our willingness to work with you . . . [i]t simply puts the question of the disposition of Hayward Place in a current context."

LPA's option period expired on January 1, 1989. In June, 1989, the BRA approved Campeau's "Boston Crossing" design, but by June, 1990, Campeau had defaulted on its payments to LPA under the lease agreement and LPA terminated its lease with Campeau. Manufacturers Hanover Trust Company, as lender, foreclosed on LPA's and Campeau's interests in the Lafayette Place Mall in February, 1991, and the project collapsed. On March 16, 1992, LPA filed suit against the city and the BRA.[7] LPA alleged that the city had breached the Tripartite Agreement by failing to work out the necessary details to effect the transfer of the Hayward Parcel after LPA exercised its option to buy, and LPA sought specific performance, or, alternatively, damages for breach of the Tripartite Agreement. LPA also sought damages for breach of the implied covenant of good faith and fair dealing, interference with contractual relations, and violation of G. L. c. 93A.

On October 21, 1994, a jury returned a verdict against the city and the BRA. The jury found that there was a contract for the purchase of the Hayward Parcel, that both the city and the BRA breached the contract, but that the BRA was not acting as an agent of the city in connection with the contract. The jury awarded LPA $9.6 million against the city. The jury also found that the BRA intentionally interfered with contractual relations between LPA and Campeau, and awarded LPA $6.4 million in damages. The trial judge then ruled that the $6.4 million verdict

---

[7]On July 18, 1990, LPA had filed suit against Campeau, alleging that Campeau had failed to use "commercially reasonable efforts" to go forward with Phase II, and therefore had violated the lease agreement between LPA and Campeau. In addition, LPA alleged that Campeau had failed to pay amounts due under the lease. The record does not reflect the disposition of this action.

against the BRA was "encompassed" within the $9.6 million award against the city. On August 17, 1995, the judge granted the BRA's motion for judgment notwithstanding the verdict,[8] ruling that the BRA is a public employer under the Massachusetts Tort Claims Act and is therefore immune from suit for intentional torts. We granted LPA's application for direct appellate review.

## II

The city makes two principal arguments in this appeal: that the Tripartite Agreement was too indefinite to constitute a binding contract, and that in any event the city was not in breach. Although the city treats these as quite distinct arguments we believe that they must be considered together to come to a fair and sensible view of the arrangement between the parties and their dealings with each other pursuant to it. There were certainly contingencies left open at the time that the parties concluded the Tripartite Agreement, principally the price to be paid, the treatment of Avenue de Lafayette and New Essex Street, and whether or not the city would choose to build an underground garage on the Hayward Parcel. But these open matters did not preclude the formation of a binding agreement. The parties specified formulae and procedures that would determine a price under the several contingencies. It would be most unfortunate if parties could not make binding, reliable agreements about such complex projects, allowing them to make commitments and seek financing for their conclusion. If the degree of specificity the city claims is necessary were insisted on, no such agreements could be concluded. But it is the other side of this same coin that the procedures necessary to lend specificity to what at the outset is not entirely specific are an integral part of the agreement the parties concluded, and, if a party does not follow those procedures, it should not be able to claim that the other side is in breach of what is necessarily still an open-ended arrangement. We conclude that there was suf-

---

[8]The judge had earlier ruled that the judgment against the BRA for breach of contract could not stand because it was inconsistent with the jury's specific finding that the BRA was not an agent of the city, and that the award of damages in tort against the BRA could not stand because they were subsumed in the contract damages awarded against the city. A claim against the defendants under G. L. c. 93A had been dismissed on motion for summary judgment prior to the commencement of the trial.

ficient evidence to find a binding agreement, as the jury indeed did find, but it is also clear, as a matter of law, that LPA failed to follow the steps required of it under the Tripartite Agreement as supplemented to put the city in breach.

## A

The first question is whether there was a valid and enforceable contract between LPA and the city or whether, as the city claims, the terms of the Tripartite Agreement as amended were too indefinite to constitute a contract. The Tripartite Agreement states that "the parties shall in good faith negotiate and enter into an agreement," which the city argues indicates that no binding agreement had been concluded. The city points out that Section 6.02 leaves undetermined the contract price and exactly what is to be included in the Hayward Parcel. In some cases, the failure to reduce uncertainties to definite terms is fatal, particularly where parties have not yet formalized their negotiations or have left essential terms completely open. See *Mendel Kern, Inc.* v. *Workshop, Inc.*, 400 Mass. 277, 280-281 (1987) ("an intention to do something is not necessarily a promise to do it"); *Lucey* v. *Hero Int'l Corp.*, 361 Mass. 569, 574 (1972) (no option contract for purchase of land where parties merely specified boundaries to be "mutually agreed upon by both parties"); *Saxon Theatre Corp.* v. *Sage*, 347 Mass. 662, 666 (1964) (no contract for lease of property where parties merely signed letter of intent that provided no description of the land nor means of determining rent). But see *Shayeb* v. *Holland*, 321 Mass. 429, 431 (1947) (enforcing contract despite absence of price term). We adhere to the principle that "[a]n agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto," *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 217 (1935), in the circumstances that justify and gave rise to it: where parties have merely reached the stage of "imperfect negotiation" prior to formalizing a contract, and have not yet reduced their agreement to terms. *Id.* When parties have progressed beyond that stage, however, a competing principle applies: a contract should be interpreted "so as to make it a valid and enforceable undertaking rather than one of no force and effect." *Shayeb* v. *Holland, supra* at 432. See *McMahon* v. *Monarch Life Ins. Co.*, 345 Mass. 261,

264 (1962).[9] Rules of contract must not preclude parties from binding themselves in the face of uncertainty. If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding. See generally *Hastings Assocs.* v. *Local 369 Bldg. Fund, Inc.*, 42 Mass. App. Ct. 162, 169 (1997) (accepting contract calling for appointment of neutral third party to determine lease price under formula); *Cataldo* v. *Zuckerman*, 20 Mass. App. Ct. 731, 737 (1985) (accepting formula for determination of compensation as sufficiently specific to create contract).

The Tripartite Agreement provided a pricing formula to determine the price to be paid for the Hayward Parcel. When the parties signed the Tripartite Agreement, most of the information needed to complete that formula was available. Because the formula incorporated the fair market value of the parcel at the time of the future transaction, which, by definition, was unknown at the time of contracting, Section 13.01 detailed an appraisal procedure to be used for securing that information. By using that procedure, which called for the creation of a three-member appraisal board, the parties could have determined the price to be paid. In addition, the Second Supplemental Agreement states that "if the Developer shall exercise the right and option set forth in Section 6.02, there shall automatically be created an agreement by the Developer to buy and the City to sell" the Hayward Parcel. Moreover, it specified that "appropriate details of the purchase and sale . . . shall be resolved by arbitration" in accordance with a specified procedure. Although this provision was not added until 1982, it created a means for resolving disputes that might arise in the course of effecting the ultimate sale of the Hayward Parcel. In particular, questions about the exact size of the parcel and the allocation of air rights over the relevant public streets were the kind of "details" that

---

[9]As Judge Leval has said, "Notwithstanding the importance of protecting negotiating parties from involuntary judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation. It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties." (Footnotes omitted.) *Teachers Ins. Annuity Ass'n* v. *Tribune Co.*, 670 F. Supp. 491, 497-498 (S.D.N.Y. 1987).

could be worked out using this process.[10] To borrow Justice Holmes's metaphor, the machinery was built and had merely to be set in motion. See *Drummond* v. *Crane*, 159 Mass. 577, 579 (1893) (a future writing was merely "additional wheel in the machinery" of a contract). See also *Sands* v. *Arruda*, 359 Mass. 591, 594 (1971); *Coan* v. *Holbrook*, 327 Mass. 221, 224 (1951). We therefore conclude that the Tripartite Agreement, as amended, was an enforceable contract, under which both parties had certain rights and obligations.

## B

Because the Tripartite Agreement, as amended, was an enforceable contract, upon LPA's exercise of its option in 1986, there arose a bilateral contract for the purchase and sale of the Hayward Parcel. See *American Oil Co.* v. *Cherubini*, 351 Mass. 581, 585 (1967) (exercise of option creates bilateral contract for purchase and sale); *C. & W. Dyeing & Cleaning Co.* v. *DeQuattro*, 344 Mass. 739, 741 (1962) (same). See also *Blum* v. *Kenyon*, 29 Mass. App. Ct. 417, 420 (1990) (same). The question then becomes whether LPA can, as a matter of law, maintain a claim against the city for breach of that contract. "The general rule is that when performance under a contract is concurrent one party cannot put the other in default unless he is ready, able, and willing to perform and has manifested this by some offer of performance." *Leigh* v. *Rule*, 331 Mass. 664, 668 (1954). See 6 Corbin, Contracts § 1258 (1962). Any material failure by a plaintiff to put a defendant in breach bars recovery, see *Kanavos* v. *Hancock Bank & Trust Co.*, 395 Mass. 199, 202-203 (1985); *Pas-Teur, Inc.* v. *Energy Sciences, Inc.*, 11 Mass. App. Ct. 967, 968-969 (1981) (citing cases), unless the plaintiff is excused from tender because the other party has shown that he cannot or will not perform. *Leigh* v. *Rule, supra.* Even if a potential buyer notifies the seller of the buyer's intention to tender on a certain date and appears at the registry of deeds on that date with the required consideration, there may

---

[10]There is little doubt that all parties understood the general boundaries of the Hayward Parcel, given that the parcel is bounded by streets and buildings in a small city block. Although the exact details of the boundaries of the parcel might have varied depending upon what building plan was ultimately approved by the city and the BRA, this was not a situation in which the parties agreed upon the purchase of a totally unspecified or undemarcated property. Compare *Lucey* v. *Hero Int'l Corp.*, 361 Mass. 569, 573 (1972).

not be the "readiness to perform" that is a necessary condition of placing the defendant in breach. See *Mayer* v. *Boston Metro. Airport, Inc.*, 355 Mass. 344, 350-352, 354-355 (1969).

Applying these principles to the facts most favorable to LPA in this case, the question becomes whether LPA, as a matter of law, was ready, able, and willing to close the sale of the Hayward Parcel prior to January 1, 1989, and whether LPA indicated as much to the city.[11] There is no evidence in the record, and LPA does not now argue, that LPA attempted to tender payment for the Hayward Parcel between July, 1986, when it exercised its option under the Tripartite Agreement, and March, 1988, when it transferred its rights to Campeau. LPA must therefore rely on the possibility that Campeau fulfilled LPA's contractual obligations by tendering payment or demanding the deed. On December 19, 1988, less than two weeks prior to the drop dead date, Campeau informed Mayor Flynn by letter that "we have no recourse but to officially notify the city that we wish to complete the transaction and make payment immediately." This is the best evidence in the record of an attempt to tender payment to force the city to close the sale of the Hayward Parcel.[12] It is not sufficient. To place a seller in default, a buyer must manifest that he is ready, able, and willing to perform by setting a time and place for passing papers or making some other concrete offer of performance. See *Leigh* v. *Rule, supra* at 668; *LeBlanc* v. *Molloy*, 335 Mass. 636, 637-638 (1957); *Mayer* v. *Boston Metro. Airport, Inc., supra* at 354. Even attributing to

[11]The city's motion for directed verdict argued that there was no evidence to support a finding that "the plaintiff called for a closing to acquire title" to the Hayward Parcel, and that if there was a demand for closing it was insufficient. The city incorporated these defenses in its motion for judgment notwithstanding the verdict. It also argued that there was no evidence "of either the plaintiff or the city taking any steps to negotiate or enter into a purchase and sale agreement" during the option period. Moreover, the issue of LPA's failure to demand recourse to the specified arbitration procedure was raised repeatedly over the course of the litigation, including in the city's motion for special verdict, motion for directed verdict, by incorporation into its motion for judgment notwithstanding the verdict, and in the city's brief to this court. The city argued in its motion for judgment notwithstanding the verdict that LPA failed to activate the Section 13.01 appraisal procedure, and thus that the city could not be in breach.

[12]Prior to December, 1988, Campeau sent several letters to the BRA asking for an extension of the option period. In none of these letters, however, did Campeau demand tender of the deed to the Hayward Parcel or offer to tender payment.

LPA Campeau's action in sending the letter to Mayor Flynn (an attribution the city urges us not to make), Campeau's letter does not specify when, where, or how Campeau intends to tender payment, nor does it indicate what Campeau believes the city's obligations were at that point in time.[13] Compare *Fox of Boylston St. Ltd. Partnership* v. *Mayor of Boston*, 418 Mass. 816, 819-820 (1994) (notice letter specified closing date and location); *Bucciero* v. *Drinkwater*, 13 Mass. App. Ct. 551, 552-553 (1982) (buyer was ready, willing, and able to perform when he arrived at closing with payment). Campeau provided no suggested purchase price, nor even a suggestion as to when Campeau and the city should meet to resolve the remaining differences. Finally, this single sentence is embedded in a long letter to the mayor sent only weeks prior to the termination of the option period. It was an empty gesture that could not possibly have been acted on in the time remaining until LPA and Campeau forfeited their rights under the Tripartite Agreement.

LPA might claim that neither it nor Campeau could have tendered and thus put the city in breach, because absent a final delineation of what the parcel contained and an appraisal of what the parcel was worth there was no basis for a definitive tender. But the agreement between the parties specified mechanisms for resolving just these open questions. Indeed it is only because such mechanisms were specified that we have been willing to hold that the arrangement between the parties is definite enough to constitute a binding agreement.

Under the Section 6.02 price formula, the parties could not have completed the transaction without using the procedure set forth in Section 13.01 to determine whether any increase in the fair market value of the parcel since 1978 was attributable to the construction of Phase I. The Tripartite Agreement does not specify which party has the obligation to trigger Section 13.01's appraisal process; both parties share this responsibility. *Neither* party could be ready, able, and willing to close the sale until this procedure was at least initiated. Given that this information had not been obtained, and that neither LPA nor Campeau ever sought to obtain it, LPA cannot, as a matter of law, have put the city in default. See *Kanavos* v. *Hancock Bank & Trust, supra* at

[13]It was also unhelpful of Campeau to send this "tender" to Mayor Flynn, given that officials from both Campeau and LPA testified that they knew that the BRA, and not Mayor Flynn's office, had primary responsibility for the transaction.

203 ("[i]f neither could perform, even if the [defendant] repudiated the contract, neither could recover").

Similarly, under the arbitration clause of the Second Supplemental Amendment, LPA, the city, and the BRA shared responsibility for using arbitration to resolve the remaining differences that LPA claims prevented it from closing the transaction.[14] Neither LPA nor the city activated those procedures. LPA's complaint that the city and the BRA breached the contract by failing to determine the exact size and composition of the Hayward Parcel is undermined by LPA's failure to initiate arbitration about the undecided details or even to propose to the city that the procedures specified in the Tripartite Agreement should be used to resolve these differences. Similarly, questions about the treatment of Avenue de Lafayette and the allocation and value of air rights over it and other streets could have been answered in arbitration, but neither LPA nor Campeau ever sought such answers.

LPA's claims must thus rest on the possibility that even if its tender — particularly the December 19, 1988, letter from Campeau to Mayor Flynn — was insufficient, LPA (and Campeau) should be excused from its obligation to tender because the city's tactics and delays demonstrated that it would not perform under the contract. See *Leigh* v. *Rule, supra* at 668 ("the law does not require a party to tender performance if the other party has shown that he cannot or will not perform"). LPA claims, and the trial judge in denying the city's motion for directed verdict or judgment notwithstanding the verdict cites the fact, that the city failed to secure needed appraisals with which to determine the price for the Hayward Parcel,[15] that the BRA had proposed zoning regulations that placed unacceptable height restrictions on the parcel, that the city's transportation department was threatening to route a street through the parcel, and that LPA, Campeau, the city, and the BRA had failed to reach agreement as to how to treat the Avenue de Lafayette. These facts, taken alone or together, do not excuse the obligation to

---

[14]LPA only brought suit in 1992, long after such recourse to arbitration to fix obligations would have been pointless, and so the city is entitled simply to claim that it had never been put in breach.

[15]In the Tripartite Agreement, the city was obligated to obtain appraisals of the 1978 value of parcels D-3 and D-4. Although it secured an appraisal for parcel D-3, it did not for D-4. The city argues, however, that the appraisals for D-1, D-2, and D-3 sufficed to determine the value of D-4, which was a very small part of the over-all parcel.

tender. There was testimony from Marco Ottieri, LPA's project manager, that throughout the mid-1980's, LPA was committed to purchasing the Hayward Parcel regardless of its ultimate configuration and of restrictions placed upon the parcel by the city, because it would "build whatever we could build there profitably." He stated that LPA would have bought the parcel regardless of height restrictions and whether or not the city kept open Avenue de Lafayette. This seriously weakens LPA's argument that the city's proposed regulation of the Hayward Parcel materially affected the transaction or amounted to a repudiation.

Unlike a situation in which a defendant clearly expresses an unwillingness to perform, thereby repudiating the contract,[16] here LPA seeks to attribute repudiation to the city based on the mere fact that uncertainties remained that LPA shared responsibility for resolving. Compare *Hastings Assocs.* v. *Local 369 Bldg. Fund, Inc.*, 42 Mass. App. Ct. 162, 177 (1997) (where defendant indicated that it would not fulfil its obligations, defendant was in default and plaintiff was not obliged to use specified procedures to determine value of business). In this circumstance, where a complex contract leaves certain key terms to be decided by formulae and procedures, and where both parties share responsibility for activating those procedures, the plaintiff cannot be ready, able, and willing to tender, nor can the plaintiff put the defendant in default, unless the plaintiff attempts to use the contractually specified mechanisms to overcome the very uncertainties they were designed for. If two parties form an agreement that incorporates procedural devices to overcome unknowns, a plaintiff must at least attempt to make use of those devices before he can claim that the unknowns prevented meeting his obligations at law. This is particularly true in a complex and heavily regulated transaction such as this one, where public entities and public and elected officials with changing policies and constituencies are involved, and the transaction spans many years. This is not to say that governments are absolved from performing contractual obligations, but where a government contract specifies procedures and methods

[16]Compare *Kanavos* v. *Hancock Bank & Trust Co.*, 395 Mass. 199, 201-202 (1985) (bank repudiated option contract to sell shares of stock by selling shares to a third party); *Limpus* v. *Armstrong*, 3 Mass. App. Ct. 19, 22 (1975) (defendants repudiated purchase and sale contract by selling property to third party).

a private party must be particularly assiduous to comply with them. "Men must turn square corners when they deal with the Government." *Rock Island, Ark. & La. R.R.* v. *United States*, 254 U.S. 141, 143 (1920) (Holmes, J.). LPA knew at the time it entered into the contract with the city that political bodies have various obligations and constraints, and that closing the sale after exercising its option would require agreeing on the transaction's specifics. We therefore conclude as a matter of law that LPA was not excused from its obligation to put the city in default, and that LPA did not fulfil this obligation.

## C

LPA alleges not only that the city breached the Tripartite Agreement but that it did so in bad faith. This allegation of bad faith does not change our analysis in the preceding subsection.

The last clause of the Third Supplemental Agreement states that the January 1, 1989, drop dead date shall not apply if "the City and/or the [BRA] shall fail to work in good faith with the Developer through the design review process to conclude a closing." The Third Supplemental Agreement, however, was not signed until October 29, 1987, immediately prior to LPA's transfer of its rights to Campeau.[17] There is overwhelming evidence that the review process progressed appropriately as soon as Campeau initiated the process in the spring of 1988,[18]

[17]Campeau's actions in this regard must be attributed to LPA, for if they are not then the city's alternate argument that LPA abandoned the contract when it transferred its rights to Campeau would take on considerable force. LPA cannot have it both ways.

[18]Although LPA complains that the BRA's handling of the design review process prior to October, 1987, when the Third Supplemental Agreement was signed, violated the implied covenant of good faith, we reject this claim on two grounds. First, when the parties amended their agreement in 1987 and included a good faith clause, the slate was wiped clean for these purposes. Second, LPA failed to show that any delay in the design review process prior to 1988 was attributable to bad faith on the part of the city or the BRA rather than a lack of preparedness or persistence on LPA's part. LPA was engaged in discussions and negotiations with the BRA during 1984, 1985, and 1986, and may have completed the first phase of the BRA's four-stage authorization process by submitting an initial sketch of its plans for the Hayward Parcel, but LPA concedes that it did not progress beyond that very preliminary point. LPA did not press forward with its design, and it therefore cannot complain that its design was never approved.

only months prior to the drop dead date.[19] Campeau's letters to the BRA during 1988 consistently demonstrate that the design review process was proceeding smoothly and in a collaborative fashion.[20] Thus, LPA cannot argue that the BRA or the city acted in bad faith with regard to the design review process during this period.[21]

Had bad faith infected the design review process itself, the drop dead date would have been extended automatically according to the terms of the Third Supplemental Agreement. As the review process was not so infected, LPA's bad faith claim rests on the fact that the BRA refused to extend the drop dead date despite Campeau's repeated requests for such an extension. A duty of good faith and fair dealing is implicit in the performance of a party's contractual obligations, see *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 102-103 (1977), and generally if parties modify an existing contract, their modification must be made in good faith: one party cannot extract the modification from the other wrongfully. See U.C.C. § 2-209, comment 2 (1989). But LPA cites no authority for the proposition that the refusal by one party to accede to a modification that would inure to the benefit of the other party is, in itself, bad faith, where the only ill motive alleged is a desire to avoid the benefit in question. Absent bad faith in the design review

[19]On April 25, 1988, Campeau's senior vice-president, Lenard McQuarrie, sent the BRA's director a letter indicating that Campeau had "begun to marshal" resources for the project and was about to "initiate" the review process. On May 16, 1988, McQuarrie stated that Campeau was "beginning to commit significant funds to preliminary design . . . for the Hayward Place site."

[20]A June 17, 1988, letter from McQuarrie to the BRA stated that "[b]ased on the cooperation we are receiving from both yourself and your staff, we are optimistic that the project will proceed quickly through the . . . Development Review process." Similarly, an October 21, 1988, letter stated that "[w]e are making excellent progress on the . . . master planning of Boston Crossing and have begun the . . . review process." And on December 19, 1988, Campeau's letter to Mayor Flynn stated that all parties were "making good progress towards the final approval of this project."

[21]Moreover, even if the city *did* act in bad faith in the design review process and thus the option period was extended beyond January 1, 1989, neither Campeau nor LPA ever attempted to enforce the agreement by seeking arbitration, tendering payment, or seeking a closing after that date. As noted above, Campeau received design authorization in June, 1989, but went bankrupt in 1990. LPA did not then renew its negotiations with the city, but instead filed suit against Campeau in July, 1990, and against the city and the BRA in March, 1992.

process, the city and the BRA were under no contractual obligation to grant an extension to LPA. Even if the defendants' refusal to extend the deadline was motivated by the possibility of evading the pricing formula in the Tripartite Agreement, as LPA suggests,[22] that refusal could not constitute bad faith, because the BRA had no contractual duty to grant the extension that LPA sought. Compare *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 472 (1991) (finding of bad faith justified where contract required defendant to approve a development plan and defendant refused to do so in order to extract monetary concessions from plaintiff). See Restatement of Contracts § 205 comment a (1979).

Finally, the mere fact that the city did not convey the Hayward Parcel to Campeau prior to January 1, 1989, does not support a claim of bad faith. Particularly given the uncertainties that LPA added to the transaction — including the substitution of Campeau for LPA and Campeau's including in its design proposals submitted for review designs for a much larger project, the Boston Crossing project, than LPA's original project that referred only to the Hayward Parcel — LPA cannot maintain that the city acted in bad faith by not completing the transaction, unless LPA and Campeau had also done all they could to force the city to close the sale. Had LPA, or Campeau, been serious about putting the city in default, it could either have indicated more clearly that it was ready, able, and willing to close the sale by indicating its understanding of the exact composition of and price to be paid for the Hayward Parcel and setting a time and place for a transfer of the deed, thereby forcing the city to make use of the appraisal and arbitration procedures, or itself pressed the appraisal and arbitration procedures specified in the Tripartite Agreement to resolve all remaining disagreements. That it did none of these things bars

---

[22]LPA presented evidence that during the period in which LPA sought authorization of the sale to Campeau, the city's real property board publicly expressed concern that the pricing formula in the Tripartite Agreement was unfavorable to the city. On December 30, 1987, Commissioner J. Edward Roche of the city's real property department wrote Mayor Flynn expressing concern that a transfer of rights from LPA to Campeau might bring about a "windfall" to Campeau because of the pricing formula in Section 6.02. LPA also showed that the minutes of a meeting of the real property board on January 22, 1988, stated that "the Board expressed its desire . . . to receive the fair market value for the Hayward Parcel (abandoning the Tripartite formula)."

its claim against the city.[23] Neither party tendered performance, and neither was in breach or default. See *Flynn* v. *Wallace*, 359 Mass. 711, 716 (1971); *Hapgood* v. *Shaw*, 105 Mass. 276, 279 (1870). See also Corbin, Contracts § 663 (1960); § 1258 (1962).

## III

We turn now to LPA's claims against the BRA. The Superior Court jury found that the BRA tortiously and intentionally interfered with LPA's contractual relations with Campeau. The judge granted the BRA's motion for judgment notwithstanding the jury's verdict. The judge ruled that the Massachusetts Tort Claims Act (Act), G. L. c. 258, § 10 (*c*), renders the BRA, as a "public employer," immune from suit for "any claim arising out of an intentional tort, including . . . interference with contractual relations." LPA argues that the BRA was not entitled to this ruling because it had raised the bar of the statute in an untimely fashion; because the BRA was an "independent body politic and corporate" and as such explicitly excluded by G. L. c. 258, § 1, from the immunity accorded by § 10 (*c*); and because, even if § 10 (*c*) did apply to the BRA, this would only remit the BRA to its situation before the enactment of c. 258, at which time the BRA was amenable to suit for intentional torts.

## A

Although the BRA did not raise the bar of the statute in a motion to dismiss or at summary judgment, it did do so in its motion for a directed verdict at the close of all the evidence. The BRA renewed this argument in a motion for judgment notwithstanding the verdict. The judge ruled that this was sufficient, and that there had been a "flurry of arguments from both sides" on the issue. The only relevant authorities LPA cites for the proposition that the BRA raised this issue too late have to do with refusals to grant leave to amend pleadings because of prejudice to the nonmoving party. See *Mathis* v. *Massachusetts Elec. Co.*, 409 Mass. 256, 264 (1991); *Hamed* v. *Fadili*, 408 Mass. 100, 105 (1990). These authorities recognize that this sort of matter is committed to the discretion of the judge. Assuming

---

[23]The jury returned a special verdict that affirmed that "L.P.A. perform[ed] its obligations under the contract." This verdict was incorrect as a matter of law, given the fact that LPA fulfilled none of the obligations set out above.

that this should be treated as a motion to amend the pleadings, we conclude that the judge did not abuse his discretion. This is particularly so because the status of the BRA for purposes of § 10 (*c*) is a purely legal question not requiring recourse to the jury.

### B

In *Whitney* v. *Worcester*, 373 Mass. 208, 212 (1977), and *Morash & Sons* v. *Commonwealth*, 363 Mass. 612 (1973), we warned that, if the Legislature did not act to abrogate the immunity from liability in tort accorded at common law to governmental entities, this court would do so. The Massachusetts Tort Claims Act followed in 1978, providing a scheme of tort liability for "public employers" in certain circumstances and subject to several conditions. See generally Glannon, Governmental Tort Liability under the Massachusetts Tort Claims Act of 1978, 66 Mass. L. Rev. 7, 10 (1981). Section 10 (*c*) excludes liability for intentional torts from the scope of c. 258 and specifically mentions the tort of interference with contractual relations. See G. L. c. 258, § 10 (*c*). Section 1 defines a public employer as

> "the commonwealth and any county, city, town, educational collaborative, or district, including any public health district or joint district or regional health district or regional health board established pursuant to the provisions of section twenty-seven A or twenty-seven B of chapter one hundred and eleven, and any department, office, commission, committee, council, board, division, bureau, institution, agency or authority thereof . . . which exercises direction and control over the public employee, but not a private contractor with any such public employer, the Massachusetts Bay Transportation Authority, the Massachusetts Port Authority, the Massachusetts Turnpike Authority, or any other independent body politic and corporate. With respect to public employees of a school committee of a city or town, the public employer for the purposes of this chapter shall be deemed to be said respective city or town."

The Superior Court judge ruled that the BRA was not an "independent body politic and corporate." Neither the statute

itself nor our prior decisions allow a ready answer to the controversy the parties raise about this classification. Certainly the term is not self-defining. The leading case on this matter, the learned opinion of the Appeals Court in *Kargman* v. *Boston Water & Sewer Comm'n*, 18 Mass. App. Ct. 51 (1984), see *Commesso* v. *Hingham Hous. Auth.*, 399 Mass. 805, 808 (1987), traces the history of the term "body corporate and politic" from its original appearance in the Preamble to our Constitution to its present usage to designate "a legal entity [created by the Legislature] to perform specified tasks deemed to be essential public functions." *Kargman, supra* at 55. It is only the subset of *independent* bodies corporate and politic that do not enjoy immunity from intentional torts under § 10 (*c*). What entities, in addition to the three specifically mentioned in § 1, are to be identified as independent bodies corporate and politic we have been left to discern from a rather inadequate set of hints. The term itself is not very helpful, so that the Appeals Court in *Kargman* sought to extrapolate from the list of authorities specifically designated as independent in § 1 to instances not specifically named. It identified two general features of the designated entities: financial independence and political independence. The court went on to identify certain indicia of financial and political independence, *id.* at 56-58, and concluded that the Boston water and sewer commission was such an independent body. By defining the term independence in terms of financial and political independence, the *Kargman* analysis at least has the virtue of disaggregating the term into two possibly more manageable units, but the norm is still defined by reference to itself, and that is a problem.

The Superior Court judge, in a thorough and closely reasoned memorandum, applied the *Kargman* analysis to the situation of the BRA. He reached his conclusion that the BRA is not an independent body politic by emphasizing the factors that detract from the BRA's political independence: when initiating urban renewal projects it is subject to stringent public notice requirements and requires approval for many of its actions at the State and local level. He also found lacking indicia of financial independence, in that the BRA must account for its expenditures at the State and the local level and may receive State financial assistance for its urban renewal projects and advances to cover certain of its expenses. He concluded that "the BRA is subject to many checks on its power to initiate and carry out redevelop-

ment projects in Boston, which do not comport with political and financial independence. It is significantly less autonomous than either the MBTA, Turnpike, or Massport." LPA points out the many ways in which the BRA has financial and political independence similar to that of the three authorities named in § 1: removal of authority members only for cause; its ability to sue and be sued in its own name; its ability to hold title to property in its own name; its enjoyment of the power of eminent domain; its ability to incur indebtedness and issue bonds without pledging the credit of the State or city; and its ability to charge market rents for its properties. LPA also compares the BRA to the Boston water and sewer commission, which was held to be independent in *Kargman.* Moreover, LPA points out that some of the features urged by the BRA as indicia of a lack of independence, such as the oversight by the State auditor of its expenditures which the judge mentions, apply to the three named authorities as well. This battle of factors seems much closer to a standoff than either the BRA's or the judge's analysis would acknowledge.

Any analysis that relies heavily on the *Kargman* factors must cope with the embarrassment that just the factors that are discerned in *Kargman* as the indicia of independence of the three named entities are present with at least as much force in the case of Boston, other cities and towns, and the Commonwealth itself — all of which are designated at the beginning of § 1 as public employers. The BRA suggests that perhaps recourse to a possible underlying rationale for the designation of the three named entities might assist analysis: they all provide services for a fee not to the general public but to that specific segment of the public that chooses to use those services, and so it is fair that the users bear the cost in higher fees of the injuries intentionally inflicted by the authorities. This is only mildly convincing. We do not see why the costs of injuries inflicted by non-independent bodies should be borne by the injured parties alone and not by the public in general.[24]

Though we do not decline the illumination that these proposals and analyses might offer, we probably cannot do much better in this case than to rely on analogy, that logically imperfect but inveterate tool of the law in tight corners. See generally Brewer, Exemplary Reasoning: Semantics, Pragmatics, and the

---

[24]In *Kargman* v. *Boston Water & Sewer Comm'n*, 18 Mass. App. Ct. 51, 56 n.5 (1984), the Appeals Court cast doubt on this criterion.

Rational Force of Legal Argument by Analogy, 109 Harv. L. Rev. 925 (1996); Levi, An Introduction to Legal Reasoning (1949). And here the closest analogy to the BRA are the local housing authorities, to which in *Commesso* we declined to assign independent status for the purposes of §§ 1 and 10 (*c*). See *Commesso, supra* at 809. As the Superior Court judge noted, it is significant that redevelopment authorities were created by the Legislature to assume the powers, such as land assembly and the carrying out of redevelopment projects, formerly held by housing authorities. See St. 1952, c. 617, § 4, amending G. L. c. 121, § 26QQ. In communities that choose not to establish redevelopment authorities, the powers assigned to redevelopment authorities remain with the housing authorities. See G. L. c. 121B, § 9. If a community chooses to establish a redevelopment authority, the governance of that authority is the same as that which applies to a housing authority, G. L. c. 121B, §§ 5-7. And, as the Superior Court judge pointed out,

> "As operating agencies, housing and redevelopment authorities enjoy the same powers, including but not limited to the power to: sue and be sued; work with the federal government on urban renewal projects; receive public or private loans and grants; take property by eminent domain; clear and improve property; enter into contracts necessary to carry out housing and urban renewal projects; make relocation payments to displaced businesses or persons; borrow money upon the security of their bonds or notes; invest in securities; contract with organizations undertaking c. 121A projects; make and amend rules and regulations; and join with other operating agencies in exercising their respective powers. G. L. c. 121B, § 11."

Indeed, the two-page chart provided by LPA as an appendix to its brief here comparing the political and financial situation of various types of entities in the Commonwealth shows only one nontrivial difference[25] between the BRA and a housing authority: the existence of statutory limits on the rent that housing authorities may charge tenants, see G. L. c. 121B, § 32, and the absence of such constraints on sales and leases of property

---

[25]LPA also notes that the BRA does not need planning board approval for projects, whereas a housing authority does. This is because the BRA has had transferred to it the functions of the city's planning board in respect to its projects.

by a redevelopment authority under G. L. c. 121B, § 49. But of course this difference is merely the result of the assignment of functions to a redevelopment authority in communities that choose to establish one. If redevelopment functions remain in the housing authority, which then plays a dual role pursuant to G. L. c. 121B, § 9 (*b*) or (*c*), then the housing authority too, in respect to those functions, may charge market rents.[26] And it would be captious to suggest that a housing authority does or does not enjoy the immunities of the Act depending on whether redevelopment functions have been left with it.

The BRA is unique among redevelopment authorities and enjoys a special statutory basis. See generally Aronson, The Boston Redevelopment Authority: A Quasi Public Authority, 43 B.U. L. Rev. 466 (1963). The most significant difference between the BRA and other redevelopment authorities is that the BRA functions as the city's planning board and enjoys the powers of the State housing board in respect to c. 121A urban renewal projects.[27] See St. 1960, c. 652. See also *Opinion of the Justices*, 341 Mass. 760, 787-788 (1960). But both a city planning board and the State housing board would certainly be within the § 1 definition of public employers for the purposes of G. L. c. 258, § 10, and the addition of their powers should not make the designation of the BRA as a public employer less apt.

Finally, we resolve whatever indeterminacy this analysis may leave in favor of subjecting the BRA to the general regime of c. 258. The BRA is certainly a public body, a governmental entity of some sort performing public functions. Any doubts about the BRA's status under the difficult and uncertain designation of "independent body politic and corporate" should be resolved against such a designation, because of the desirability of making the c. 258 regime as comprehensive as possible, thus avoiding reintroducing the "crazy quilt" of immunities, *Rogers v. Metropolitan Dist. Comm'n*, 18 Mass. App. Ct. 337, 338-339 (1984), which the Act was meant to replace. This is particularly

---

[26]General Laws c. 121B, § 9, states that housing authorities with redevelopment authority have the powers granted regular redevelopment authorities under G. L. 121B, § 49.

[27]General Laws c. 121A, § 4, permits the housing board to make rules and regulations regarding the approval of redevelopment projects. The housing board must approve most redevelopment projects, G. L. c. 121A, § 5, and must inspect the construction of redevelopment projects to ensure that construction complies with the approved proposal. G. L. c. 121A, § 8.

so because any decision taking a governmental entity out of the category of "public employers" has the effect not only, as here, of making that entity liable for intentional torts, but also of removing the immunities provided by the other provisions of § 10. This may have large consequences to which none of our cases so far has attended. Of particular concern is removing a governmental body from the protection of the immunity of § 10 (*b*), which refers to

> "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused."

We conclude that the BRA is a public employer not excluded from the scope of the Act.

## C

We have less difficulty disposing of LPA's ingenious argument that, even if the BRA is not an independent body politic and corporate, § 10 (*c*) does not confer upon it immunity from liability for intentional torts. Section 10 of c. 258 provides that "[t]he provisions of sections one to eight, inclusive, shall not apply to" any of the claims listed in that section. G. L. c. 258, § 10. The list includes, among other things, claims based "on the exercise or performance or the failure to exercise or perform a discretionary function," § 10 (*b*); and claims arising out of intentional torts, § 10 (*c*). Other excluded claims relate to assessment or collection of taxes, § 10 (*d*); issuance, denial or revocation of permits or licenses, § 10 (*e*); inadequate or negligent inspections, § 10 (*f*); failure to provide fire protection or police services, § 10 (*g*)-(*h*); and negligent provision of medical services, § 10 (*j*) (2). Section 2 provides for liability of public employers for negligence, G. L. c. 258, § 2, and §§ 4-7 impose certain prerequisites for claims against public employers, including the prior presentation of such claims for administrative action, and provide for procedures for their resolution. G. L. c. 258, §§ 4-7. LPA argues that because § 10 provides that none of these provisions shall apply to intentional torts, the result is that such claims are simply remitted to the preexisting law governing liability. And because the BRA's

enabling statute, G. L. c. 121B, § 13, which preexisted c. 258, provided that the BRA shall be "liable . . . in tort in the same manner as a private corporation," the BRA continues to be liable for the intentional tort charged here. LPA finds confirmation for this conclusion in our decision in *Spring* v. *Geriatric Auth. of Holyoke*, 394 Mass. 274 (1985), in which we stated that "[b]y excluding intentional torts from the scope of G. L. c. 258, the Legislature left open the matter of governmental liability for intentional torts. Consistent with the common law principles of governmental immunity which preceded the Massachusetts Tort Claims Act, we conclude that public employers retain their immunity from suits arising from intentional torts." *Id.* at 284-285. Because the preexisting law, to which we are remitted according to LPA's argument, allowed for BRA's liability for intentional torts, the BRA does not enjoy immunity for intentional torts now.

LPA's reading of the statute is not in accord with its over-all purpose of enacting a comprehensive and uniform regime of tort liability for public employers in the wake of our decisions in *Whitney* v. *Worcester*, 373 Mass. 208, 212 (1977), and *Morash & Sons* v. *Commonwealth*, 363 Mass. 612 (1973). Although we have not undertaken a review of such legislation, it is likely that the enabling statutes of many public bodies contain a variety of provisions relating to the tort liability of those bodies. It would be the upshot of LPA's argument that, whenever any of the provisions of § 10 (including, for instance, those excluding liability for discretionary functions or for failure to grant or renew a license or permit) applied, we would be remitted to the preexisting law. It is sufficient to mention that the preexisting law to which LPA refers, G. L. c. 121B, § 13, applies to the Boston Housing Authority (BHA) as well, so that the BHA on this argument would be liable for the whole range of claims excluded by § 10.[28] Compare *Commesso* v. *Hingham Hous. Auth., supra* at 809. Such a reading would be so manifestly against the intention of the Legislature to introduce a uniform regime of tort liability for public bodies, see *Rogers* v.

[28]LPA seeks support for its argument in a 1983 amendment of G. L. c. 121B, § 13, that altered the treatment of the liability of employees of redevelopment and housing authorities. This is unpersuasive. The Legislature did not address itself directly to the operative first sentence of § 13, and we will not assume that an amendment of an independent portion of the section endorsed or reaffirmed that first sentence in the face of the strong Legislative mandate of c. 258.

*Metropolitan Dist. Comm'n, supra,* that a mere drafting infelicity will not lead us to adopt it. Similarly the statement quoted from our decision in *Spring* will not move us in that direction. In context it was quite irrelevant to the *Spring* case whether § 10 (*c*) was described as prescribing immunity for intentional torts or as remitting the matter to the preexisting common law, which in that instance would have foreclosed tort liability altogether. See *Spring, supra* at 295 (Abrams, J., concurring) (Federal Tort Claims Act, 28 U.S.C. § 2680[h] [1982], on which c. 258 is patterned, provides an interpretive guide and has been construed "as immunizing public employers from suits arising out of intentional torts"). We therefore hold that the BRA is immune under G. L. c. 258, § 10 (*c*), from suit for intentional torts.

## IV

LPA also claims that the motion judge erred in entering summary judgment against LPA on its G. L. c. 93A claims against the city and the BRA. Chapter 93A proscribes "unfair or deceptive practices in the conduct of any trade or commerce." G. L. c. 93A, § 2 (*a*). A party engages in trade or commerce when it acts in a "business context." "This court . . . has repeatedly held that c. 93A does not apply to parties motivated by 'legislative mandate, not business or personal reasons.' " *Peabody N.E., Inc.* v. *Marshfield,* 426 Mass. 436, 439-440 (1998), quoting *Poznik* v. *Medical Professional Ins. Ass'n,* 417 Mass. 48, 52 (1994). The gravamen of LPA's claim against the city and the BRA is that it was cheated out of the benefit that would have accrued to it if the agreement regarding the Hayward Parcel had been performed. This is indeed the kind of claim that is often made under c. 93A, see e.g., *Anthony's Pier Four, Inc.* v. *HBC Assocs.,* 411 Mass. 451, 475 (1991), but that does not mean that the city was engaged in trade or commerce when it entered into the arrangement nor when it took the actions of which LPA now complains. It is perfectly possible for a governmental entity to engage in dishonest or unscrupulous behavior as it pursues its legislatively mandated ends. The allowance of the motion of summary judgment was correct because the defendants' involvement in these transactions was wholly in pursuit of the legislatively prescribed mandate of G. L. c. 121A, § 2, that "the redevelopment of land not only in sub-standard areas but also in blighted open and decadent areas in accordance with a

comprehensive plan to promote the sound growth of the community is necessary." There simply cannot be any doubt that the parties' dealings took place in the context of the pursuit of the urban renewal and redevelopment goals of c. 121A and c. 121B. That is the premise of every other part of this litigation. Although we have not yet addressed the question whether a public entity is ever a proper defendant in a c. 93A action, it is quite clear that in this case at least these public entities are not.[29]

## V

Because we conclude as a matter of law that the city did not breach its contract with LPA, we reverse the judgment of the Superior Court and order entry of judgment for the city. Whatever contractual claims LPA may have against the BRA must fail for the same reason. The judgment in favor of the BRA is affirmed because we agree that it is immune from suit for an intentional tort. The judgment in favor of the city and the BRA dismissing LPA's c. 93A claims is also affirmed.

*So ordered.*

---

[29]Cases such as *Boston* v. *Aetna Life Ins. Co.*, 399 Mass. 569, 575 (1987), in which the public entity may act as a plaintiff in a c. 93A action, are not apposite. One who deals with a public entity, as for instance in providing it with goods or services, may very well be engaged in trade or commerce without the entity being so engaged as well.