**Edward ZUKER, et al.**

v.

**GENERAL ELECTRIC CAPITAL CORP.**

No. CIV. A. 98–CV–10254–RGS.

United States District Court,
D. Massachusetts.

Oct. 1, 1998.

David G. Hanrahan, Ross D. Ginsberg, Gilman, McLaughlin & Hanrahan, Boston, MA, for Plaintiffs.

Mark W. Batten, Sabin Willett, Denise E. Choquette, Bingham, Dana & Gould, Boston, MA, for Defendant.

## *MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS*

STEARNS, District Judge.

On February 11, 1998, Edward and Linda Zuker, joined by several of Zuker's real estate trusts and corporations (collectively, Zuker), brought this Complaint against a long time lender, General Electric Capital Corp. (GECC), alleging breach of contract, breach of the covenant of good faith and fair dealing, fraud, and violation of G.L. c. 93A. Zuker alleges that GECC breached a November 4, 1997 agreement to settle a number of disputes involving loans that GECC held on five Zuker properties. Zuker maintains that after he had fulfilled various conditions precedent, GECC breached the agreement

on a pretext calculated to unjustly improve its position.

On March 12, 1998, GECC filed a motion to dismiss the Amended Complaint, contending that the November contract was nothing more than a forbearance agreement whereby GECC agreed, for a consideration of $50,000, to abstain from initiating foreclosure on several delinquent notes while the parties attempted to negotiate a global settlement of their many disputes. According to GECC, the settlement proposal outlined in the November agreement simply reflected the parties' "preliminary understandings" of the outlines of a possible accord. GECC maintains that it fulfilled its obligations by postponing foreclosure while its internal credit committee gave good faith consideration to the proposed settlement. GECC also argues that Zuker's fraud count is not plead with sufficient particularity and that there is no basis for a Chapter 93A claim. On July 8, 1998, a hearing on the motion was held.

### FACTS

The relevant terms of the November agreement and the material facts alleged in the Amended Complaint, which for present purposes must be deemed true, are as follows.

### The Parties

The lawsuit was brought by Hawood SC Corp., Sign Guarn Corp., CGP–HV Inc., Edward and Linda Zuker, individually, and by Edward Zuker in his capacity as the Trustee of the Westbrook Village Realty Trust, the Washington West Realty Trust, the First Washington Realty Trust, the Hancock Village Realty Trust and the Plymouth Realty Trust. Zuker and Hawood SC are the Trustees of the Westbrook Village Realty Trust which owns the Village at Chestnut Hill Shopping Center (the Shopping Center). The Washington West Realty Trust and the First Washington Realty Trust jointly own the Ridgecrest Terrace apartment complex in West Roxbury (Ridgecrest). The Plymouth Realty Trust owns the Norwood Gardens apartment complex in Norwood (Norwood). CGP–HV as the Trustee of the Hancock Village Realty Trust owns the Hancock Village Apartments located in Boston and Brookline (Hancock Village). Sign Guarn owns the Stonybrook Condominium in West Roxbury (Stonybrook).

GECC held Notes on all five properties. The Notes were not cross-collateralized, nor were they personally guaranteed by Zuker. The Norwood and Ridgecrest Notes were secured by property that was valued, at least as of November 1997, at appreciably less than the amount of the underlying debts. Prior to this lawsuit, Zuker, Hawood SC, and Westbrook Village Realty Trust brought a separate lawsuit against GECC involving the Shopping Center Note (the Shopping Center litigation).

### The Allegations of the Amended Complaint

Zuker alleges that on "September 10, 1997, Plaintiffs and their representatives met with representatives of GECC. . . . At the meeting, GECC's representatives stated that they were authorized by GECC's internal credit committee to enter an agreement. With respect to several proposals made by the Plaintiffs, GECC's representatives stated that they could not agree to the [specifics of those] proposal[s] as [they went] beyond the authority given to them by the credit committee. With respect to the matters actually agreed upon, GECC made clear that those matters were within the authority given to them by the credit committee." Amended Complaint, at ¶ 16.

At the meeting, GECC agreed to a restructuring that "provided for (a) repayment by December 31, 1997 of (i) the Hancock Village debt, (ii) the Shopping Center debt at a compromise amount; and (iii) certain interest on the Norwood debt and (b) a restructuring of the remaining Norwood and Ridgecrest debt pursuant to so-called pre-packaged plans of reorganization in proceedings to be filed under Chapter 11 of the United States Bankruptcy Code. In addition, the Sign Guarn loan was to be extended until August, 1999." Amended Complaint, at ¶ 17.

GECC also agreed that as an alternative to the restructuring, Zuker could elect to simply repay the Norwood and Ridgecrest

Notes. This option, called the Repayment, "provided for repayment of principal and contract interest due on those loans." Both options included a provision for waiver of certain so-called "bill to borrower" expenses and default interest. Amended Complaint, at ¶ 17. These two options were formalized on November 4, 1997, in a "Forbearance Agreement" that required GECC to defer any foreclosure action to December 31, 1997, and Zukor to dismiss the Shopping Center litigation.

"The Settlement Agreement[1] provided that several specified 'events' collectively comprised Repayment and required that all such events must occur before December 31, 1997. The 'events,' with two exceptions, were all payments to GECC by Zuker Entities of debts secured by the Properties. The two non-monetary events were (a) that the Shopping Center Case be dismissed and mutual releases be exchange and (b) that 'GECC's internal credit committee shall have reviewed and approved all of the transactions [comprising Repayment] and such approval shall have been confirmed to the [Zuker Entities] in writing'. . . . Identical Approval language was included in the Restructuring alternative." Amended Complaint, at ¶ 21. Once either the Repayment or the Restructuring was completed, GECC was obligated to pay Zuker various identified disputed amounts and to return the $50,000 forbearance fee.

In December 1997, Zuker told GECC that he wished to proceed with the Repayment (not the Restructuring) and requested payoff letters from GECC. On December 22, 1997, GECC forwarded Zuker "payoff letters reflecting the full amount allegedly due and not for the amounts due if calculated in accordance with the Settlement Agreement." Amended Complaint, at ¶ 23. Zuker alleges that it is significant that during the six weeks that had elapsed since the signing of the Agreement, GECC had not calculated the payoff amounts due under the Agreement, nor had it presented the Agreement to its internal credit committee.

GECC then demanded that Zuker submit proof of his ability to make the Repayment before it would agree to convene a meeting of the credit committee. "If GECC had undertaken to perform its obligations in a reasonably diligent manner, the Plaintiffs would have been ready, willing, and able to close the transaction before December 31, 1997." Amended Complaint, at ¶ 26. Although not required to do so by the Agreement, on December 30, 1997, Zuker provided GECC with copies of commitment letters from his new lenders. GECC then informed Zuker that the year-end holidays made it impossible to assemble a quorum of the credit committee, and asked for an extension of the Agreement's December 31, 1997 termination date. "Faced with a choice between paying GECC disputed amounts of nearly $2 million more than was due under the Settlement Agreement or postponing the closing, . . . Zuker acquiesced . . . [to an extension] until January 31, 1998." Amended Complaint, at ¶ 27.

Zuker contends that the delay constituted a financial penalty because interest payments on the GECC Notes ran several thousand dollars a day higher than the rates he had negotiated with his outside lenders. "On January 9, 1998, . . . the Zuker Entities closed their refinancing in accordance with their obligations under the Settlement Agreement, paid GECC approximately $43 million representing the full amounts which GECC's payoff letters claimed on Hancock Village and Ridgecrest loans and the undisputed portions of amounts claimed by GECC on the Shopping Center and Norwood loans." Amended Complaint, at ¶ 29. On January 13, 1998, "GECC advised the Plaintiffs that the credit committee had 'rejected' the Repayment plan. Nevertheless, GECC advised that it was willing to discuss reductions in the sum owed—apparently in a lesser amount than previously agreed to by GECC's authorized representatives . . . ." Amended Complaint, at ¶ 32.

Zuker alleges that GECC chose this course after "review[ing] the loan commitment letters and recogniz[ing] that [because of decreasing interest rates] a closing might gen-

---

1. In the Amended Complaint, Zuker refers to the "Forbearance Agreement" as the "Settlement Agreement." To avoid confusion, I refer to the parties' contract simply as the Agreement.

erate funds in excess of the Repayment....
[GECC then] decided to use credit commit-
tee disapproval as a pretext to obtain consid-
eration not contemplated by the parties in
the Settlement Agreement." Amended Com-
plaint, at ¶ 32.

██ Zuker alleges that GECC breached
the covenant of good faith and fair dealing by
refusing to submit the Agreement to its in-
ternal credit committee in a timely fashion
and by using the credit committee's supposed
"disapproval" as a sham to avoid its obli-
gations under the Agreement. Zuker main-
tains that GECC deliberately stalled in order
to collect payments on the under-collateral-
ized Norwood and Ridgecrest Notes. Zuker
contends that GECC further breached the
Agreement by refusing to accept the Repay-
ment, by attempting to initiate foreclosure on
the underlying real estate, and by seizing
$350,000 from the Shopping Center's bank
account. Zuker also alleges that GECC's
agents fraudulently represented that they
had the authority to bind GECC to terms
previously established by the credit commit-
tee when in fact they either had no such
authority or GECC had no intention of hon-
oring its agents' fraudulent promises.[2] Fi-
nally, Zuker alleges that GECC's conduct
violated Chapter 93A.

### The Agreement

The Agreement is a fourteen page, single
spaced document that often defies compre-
hension. Much of the difficulty in parsing
the text stems from the fact that the Agree-
ment attempts to weave into a coherent
whole what are alternative and contradictory
methods of resolving the parties' disputes: a
debt restructuring described in § 6 and a
repayment option set out in § 6A.[3] Under
both the Restructuring and Repayment op-

tions, Zuker was obligated to perform vari-
ous conditions precedent, such as paying in
full the Hancock Village and the Shopping
Center loans, dismissing the Shopping Cen-
ter litigation, and paying the interest arrears
on the Norwood Note. Thereafter, the se-
quence of events contemplated by the parties
becomes murky at best.

The Agreement begins by identifying the
parties and the outstanding debts, and re-
cites Zuker's promise to ratify the existing
Notes (with specified exceptions). The addi-
tional material terms of the Agreement are
as follows.

§ 3. *Representations and Warranties.*
Each ... Borrower ... has adequate ...
power and authority to execute and deliver
this Agreement and to perform its obli-
gations hereunder .... GECC hereby rep-
resents and warrants to each of the Bor-
rowers that it has due power and authority
to execute and deliver this Agreement.

§ 4. *Forbearance Obligations.* Subject
to the conditions set forth in § 5 hereof,
GECC agrees to forebear from enforcing
any of its rights and remedies under the
Loan Documents for the purpose of seek-
ing repayment, acceptable restructuring,
or a combination thereof with respect to
the [outstanding notes] ·... until ... (the
*"Forbearance Termination Date"*) which
[at] the earliest [is] to occur ... [within]
five days following GECC's written notifi-
cation to the Borrowers ... of ... Zuker's
failure to comply with the Agreement ...
[or at the latest by] December 31, 1997.

Section 5 sets out the "conditions" that must
occur to make the Agreement "effective."

§ 5. *Conditions to Effectiveness.* This
Agreement shall become effective upon
satisfaction of the following conditions on
or prior to November 5, 1997:

---

**2.** GECC argues that Zuker failed to plead fraud
with the requisite particularity because the
Amended Complaint does not identify the mis-
creant agents or state clearly what it was that
they were supposed to have said by way of misdi-
rection. In his opposition, Zuker names the
three lawyer-agents, and gives the dates of the
meetings that are alleged to have taken place as
well as the substance of the alleged misrepresen-
tations. Consequently, the motion to dismiss the
fraudulent misrepresentation count will be *DE-
NIED.* Zuker is granted leave to amend his

Amended Complaint within twenty-one days of
the date of this Order to bring it in compliance
with Fed.R.Civ.P. 9(b).

**3.** While the total Repayment is not readily discer-
nible from the Agreement, the Amended Com-
plaint acknowledges that Zuker was obligated to
repay a sum discounted from the amount that
GECC would otherwise have obtained from fore-
closure.

(a) GECC and the Borrower shall have executed counterparts of this Agreement . . .

(b) The Borrowers shall have paid to GECC any and all accrued interest with respect to the principal amount of the Obligations through October 31, 1997 at the non-default rate of interest set forth in the . . . [Shopping Center, Ridgecrest and Norwood Notes] *provided,* that a portion of such accrued interest with respect to the Norwood Note equal to $1,240,000 (the "Norwood Interest Arrearage") shall not have been paid pursuant to this clause (b) but instead shall be paid in the manner otherwise set forth herein, provided, that the Norwood Interest Arrearage shall be due and payable in full on the Forbearance Termination Date if both the Restructuring and the Repayment fail to occur; and

(c) The Borrower shall have paid to GECC a forbearance fee in the amount of $50,000.

The Agreement then details the Restructuring and Repayment options in § 6 and in § 6A. The structure of § 6 is awkward. The opening paragraph of § 6 explains Zuker's option of performing either under § 6 or § 6A. The remaining paragraphs, sections (a) through (m), list the parties' various responsibilities under the Restructuring while leaving the discussion of its implementation to a brief unnumbered concluding paragraph. The pertinent provisions of § 6 are as follows.

§ 6. *The Restructuring.* Each of the following events are hereinafter collectively referred to as the "Restructuring". It is the intention of the parties hereto that, in the event that the Repayment (as hereinafter defined) does not occur on or prior to the Forbearance Termination Date, each event set forth below constituting a portion of the Restructuring occur simultaneously on or before the Forbearance Termination Date, or that none of such events (subject to the immediately following proviso) shall occur, *provided,* that (i) the events described in §§ 6(a), 6(b) and 6(c) may occur earlier than the other portions of the Restructuring, and (ii) the filing of bankruptcy petitions together with the Norwood

Plan and the Ridgecrest Plan contemplated by § 6(i) must occur on or before the earlier of December 31, 1997 or the Forbearance Termination Date. The date on which the Restructuring occurs is hereinafter referred to as the "Restructuring Date".

(a) The obligations of . . . Zuker, . . . to GECC . . . in connection with . . . (the "Hancock Note"), . . . shall have been paid in full . . . . Upon such payment, GECC shall release the collateral securing the Hancock Note.

(b) The Shopping Center Obligations (with interest at the non-default rate) shall have been paid in full, together with legal fees and late fees in an amount equal to the sum of $13,268.53, *provided,* that, in the event that either the Restructuring or the Repayment occurs in the manner and at the times contemplated hereby, GECC shall refund to the Shopping Center Borrower a portion of the principal amount of the Second Shopping Center Note . . . .

(c) The Norwood Borrower shall have paid to GECC the Norwood Interest Arrearage, *provided* that, in the event that either the Restructuring or the Repayment occurs . . . GECC shall refund . . . a portion of the Norwood Interest Arrearage equal to $300,000.

(d) The [Shopping Center] Litigation shall have been dismissed. . . .

(e) GECC shall have refunded to the Shopping Center Borrower an amount equal to the sum of (i) $65,000 . . . (ii) all amounts held in the . . . interest reserve account . . . and (iii) . . . the . . . Capital improvement account. . . .

(f) The Stonybrook Note shall have been amended [to reflect a maturity date of] . . . August 31, 1999, and . . . . legal fees and late fees [shall be capitalized].

(g) GECC shall have released the GECC/CRE–Hawood Lockbox Reserve . . . .

Section 6 then launches into a lengthy discussion (sections (h) through (k)) of the anticipated Norwood and Ridgecrest Chapter 11 bankruptcies. These sections reference certain exhibits to which the bankruptcy filings were to conform "in form and substance sat-

isfactory to GECC." While some of the referenced exhibits are attached to the Agreement, others are not. Paragraph 6(*l*), which is at the crux of the dispute, requires that GECC's internal credit committee approve in writing the terms of § 6.[4] In the closing paragraph, the Agreement states that "it is understood that at such time the Borrowers perform or cause to be performed items 6(a), (b), (c), (d), (f), (i), (j) and (k), then GECC shall perform items 6(d), (e), (f), (g), (h), (j) and (m)." [5]

The Repayment option is set out in § 6A in a similarly clumsy fashion.

§ 6A. *Repayment.* Each of the following events are hereinafter collectively referred to as the "Repayment". If any of the events set forth below fails to occur before the earlier of December 31, 1997 or the Forbearance Termination Date, the Repayment shall be deemed to have failed to occur.

(a) The events described in §§ 6(a), 6(b) and 6(c) (without regard to GECC refunds) shall have occurred.

(b) The Norwood Obligations shall have been paid in full, *provided,* that the Norwood Interest Arrearage shall be paid in accordance with § 6(c).

(c) The Ridgecrest Obligations shall have been paid in full.

(d) The Borrowers pay to GECC an amount equal to the sum of $250,000 *plus* the GECC Restructuring Legal Fees net of legal fees paid pursuant to §§ 6(a) and 6(b).

(e) GECC's internal credit committee shall have reviewed and approved all of the transactions contemplated by this Section 6A and such approval shall have been confirmed to the Borrower's in writing.

(f) The events described in § 6(d) shall have occurred.

If the Repayment occurs, GECC and the Borrower shall take all reasonable steps necessary to cause the events described in §§ 6(e), 6(f), 6(g) and 6(h) to occur. In addition, GECC shall refund (i) the Forbearance Fee (ii) a portion of the Shopping Center Obligations in accordance with § 6(b), and (iii) a portion of the Norwood Interest Arrearage in accordance with § 6(c) to the respective Borrowers.

The Agreement then lists the following covenants.

§ 7. *Covenants and Agreements.* Without any prejudice or impairment whatsoever to any of the rights and remedies of GECC contained in any of the Loan Documents ... the Borrower covenants and agrees with GECC as follows:

(a) *Interest.* The Borrower acknowledges and agrees that interest shall continue to accrue at the default rate of interest set forth in the Notes. However, during the Limited Forbearance Period, interest at the non-default rate shall be payable in accordance with the terms of the Notes, *provided,* that, in the event that both the Restructuring and the Repayment fail to occur in the manner and at the time contemplated by this Agreement, GECC reserves the right to collect interest at the default rate under the Notes which have not theretofor been paid in full as contemplated ... in the second, third, forth, and fifth unnumbered paragraphs at the beginning of this Agreement....

(c) *Implementation and Confirmation of Restructuring.* Each of the Borrowers and Edward E. Zuker shall take all reasonable steps necessary to implement the Repayment or the Restructuring, including, without limitation, the confirmation of the Norwood Plan and the Ridgecrest Plan. Each of the Borrowers shall diligently pursue any and all third party consents and agreements necessary to implement the Repayment or the Restructuring....

The Agreement concludes in pertinent part as follows.

§ 8. *Expenses.* In the event that both the Restructuring and the Repayment fail to occur in the manner contemplated by this Agreement, each of the borrowers which have failed to pay their respective Obligations in full as contemplated hereby ...

---

4. See also section 6A(e).

5. Section 6(m) directs that GECC return to Zuker the $50,000 forbearance fee upon completion of the Restructuring.

agrees to pay to GECC ... an amount equal to any and all reasonable out-of-pocket costs or expenses....

§ 13. *Miscellaneous.* This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.... This Agreement represents the entire agreement of the parties hereto as to the subject matter addressed herein and there are no other agreements ... as to such subject matter. In the event of any conflict between the provisions of this Agreement and the provisions of the documents, instruments and agreements to be executed in connection with the Restructuring, including the exhibits hereto, the provisions of such other documents, instruments and agreement shall govern.

## DISCUSSION

GECC argues that Zuker's contract claims must be dismissed for three reasons. First, GECC contends that the Forbearance Agreement does not obligate either party to actually carry out either the Repayment or the Restructuring. Next, GECC argues that even if §§ 6 and 6A could be construed as parts of a binding agreement, their enforceability was contingent upon the approval of the settlement by GECC's internal credit committee.[6] Finally, GECC argues that in any event there was no breach of the Agreement because the internal credit committee's actual review was timely and fair.

■ When reviewing a motion to dismiss, "[w]e must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss." *Vartanian v. Monsanto Company,* 14 F.3d 697, 700 (1st Cir.1994); *Knight v. Mills,* 836 F.2d 659, 664 (1st Cir.1987). GECC argues that the "For-

bearance Agreement," as the name implies, required nothing more than that GECC, in exchange for the $50,000 forbearance fee, postpone foreclosure proceedings on the delinquent Notes until December 31, 1997. GECC maintains that the entire Agreement can be summed up succinctly as: "Plaintiffs paid cash; GECC gave time." GECC Memorandum, at 3. The Repayment and the Restructuring options set forth at § 6 and § 6A of the Agreement, in GECC's view, were no more than expressions of present intention to which neither party was bound. See *Phoenix Spring Beverage Co. v. Harvard Brewing Co.,* 312 Mass. 501, 506, 45 N.E.2d 473 (1942). In this regard, GECC does not read either § 6 or § 6A as imposing any affirmative obligations on GECC; but merely as defining the events by which a Restructuring or Repayment would be deemed to have (or not to have) occurred. GECC also argues that the Agreement is not a binding because completion of the Restructuring required third party consent to certain material terms, as well as approval of the form of the bankruptcy petitions that had yet to be drafted. GECC finally maintains that § 7 of the Agreement ("Covenants and Agreements,") bound only Zuker and not GECC.[7]

■ In Zuker's view, GECC's reading of the Agreement ignores its overall purpose and the clearly expressed intent of the parties to bind themselves to one form or the other of the global settlement. Zuker agrees that the Agreement contained several conditions precedent requiring unilateral action on his part, but argues that once he had performed (which he did), GECC's reciprocal obligations under either § 6 and 6A were triggered. Zuker's reading of the Agreement is the more consonant with the court's obligation to construe even an obscure and difficult contract as a rational business instrument. *Finn v. McNeil,* 23 Mass.App.Ct.

---

6. GECC also makes the technically accurate, but very unpersuasive argument, that the Agreement did not in so many words obligate it to actually seek the credit committee's review before the Agreement expired. GECC Memorandum, at 14. Cf. *Lubin & Meyer, P.C. v. Lubin,* 427 Mass. 304, 309–310, 693 N.E.2d 136 (1998).

7. As written, § 7 required Zuker, with no mention of GECC, to "take all reasonable steps necessary to implement the Repayment or the Restructuring, including, without limitation, the confirmation of the Norwood Plan and the Ridgecrest Plan ... [and to] diligently pursue any and all third party consents and agreements necessary to implement the Repayment or the Restructuring." Agreement, § 7(c).

367, 372, 502 N.E.2d 557 (1987). Under § 5, the Agreement was to become effective after Zuker paid the forbearance fee and made certain interest payments. In § 4, GECC agreed to "forbear from enforcing any of its rights and remedies under the Loan Documents ... until ... (the *"Forbearance Termination Date"*) which [at] the earliest [is] to occur ... [within] five days following GECC's written notification to the Borrowers ... of ... Zuker's failure to comply with ... [the] Agreement ... [or at the latest by] December 31, 1997. Agreement, § 4(a) and (g).[8]

In § 6, the parties stated their agreement that either the Repayment or the Restructuring would occur on or before December 31, 1997, by providing that "[i]t is the intention of the parties ... that, in the event that the Repayment (as hereinafter defined) does not occur on or prior to the Forbearance Termination Date, each event ... constituting ... the Restructuring [shall][9] occur ... on or before the Forbearance Termination Date ...." The terms of the Restructuring are set out in sections 6(a) through (m). The concluding paragraph then clearly explains the parties' obligations once GECC's credit committee approval was forthcoming: "[I]t is understood that at such time the Borrowers perform or cause to be performed items 6(a), (b), (c), (d), (f), (i), (j) and (k), *then GECC shall perform items 6(d), (e), (f), (g), (h), (j) and (m)."* Agreement, § 6. (Emphasis added.)

Section 6A begins by stating that "[i]f any of the events set forth below [detailing the Repayment option] fails to occur before the earlier of December 31, 1997 or the Forbearance Termination Date, the Repayment shall be deemed to have failed to occur." While this passage is somewhat cryptic, it clearly brackets the opening language of § 6 that "in the event that the Repayment ... does not occur on or prior to the Forbearance Termi-

nation Date, each event ... constituting ... the Restructuring [shall] occur ... on or before the Forbearance Termination Date ...." Agreement, § 6. In other words, § 6A explains what is required for the Repayment to be deemed to have (or to have not) occurred, consistent with § 6's directive that if the Repayment did not occur, then the Restructuring was to be completed by the Forbearance Termination Date.

Section 6A (the Repayment option) required Zuker to complete, in a somewhat modified form, the first four obligations described in the Restructuring option, §§ 6(a), (b), (c), and (d), and, in addition, to pay off the Norwood and Ridgecrest Notes. If these events occurred, and if the credit committee gave written approval, then "GECC and the Borrower *shall take* all reasonable steps necessary to cause the events described [under the Restructuring option] in §§ 6(e), 6(f), 6(g) and 6(h) to occur. In addition, GECC *shall refund* (i) the Forbearance Fee (ii) a portion of the Shopping Center Obligations in accordance with § 6(b), and (iii) a portion of the Norwood Interest Arrearage in accordance with § 6(c) to the respective Borrowers." Agreement, § 6A. (Emphases added.)

Language elsewhere in the Agreement confirms Zuker's reading of it as a mutually binding instrument. For instance, § 7(a) provided GECC with a specific remedy if both the Repayment and the Restructuring failed. Section 7(a) stipulates that "[t]he Borrower covenants and agrees with GECC ... that [while] interest shall continue to accrue at the default rate of interest set forth in the Notes ... during the Limited Forbearance Period, interest at the non-default rate shall be payable in accordance with the terms of the Notes, *provided,* that, in the event that both the Restructuring and the Repayment fail to occur in the manner and at the time contemplated by this Agreement,

---

**8.** GECC's argument that the all of the binding terms of the contract are contained in the first five sections of the Agreement is belied by the actual language of § 5. Section 4 sets forth the time frame for the forbearance period which was to expire either on December 31, 1997, or five days after GECC notified Zuker that he was in breach of the Agreement. If the Agreement was only triggered by Zuker's performance of his duties under § 5 and those duties were the only binding terms applicable to Zuker, then there could be no way that Zuker could thereafter be in breach of the Agreement under the terms of § 4.

**9.** This is my word, but one inherent in the context of this very convoluted sentence.

GECC reserves the right to collect interest at the default rate under the Notes which have not theretofor been paid in full . . . ." If the Agreement simply entailed, as GECC argues, a payment by Zuker in exchange for GECC's forbearance, it is difficult to understand why its drafters felt it necessary to provide for this contingency.

In the same vein, it seems incongruous that the parties would also have stipulated that the terms of the documents drafted in connection with the Restructuring option would trump the terms of an Agreement whose only supposed subject matter was forbearance. Yet, § 13 provides that "[i]n the event of any conflict between the provisions of this Agreement and the provisions of the documents, instruments and agreements to be executed in connection with the Restructuring, including the exhibits hereto, *the provisions of such other documents, instruments and agreement shall govern.*" (Emphasis added.) [10]

GECC's argument that the Agreement does not require completion of either the Repayment or Restructuring option because § 7(c) bound only Zuker to take the "reasonable steps necessary to implement the Repayment or the Restructuring," must be viewed in the context of the entire Agreement. The "steps necessary" referred to are the conditions precedent to GECC's obligations. Requiring Zuker to use his best efforts to complete these tasks makes sense given that GECC's obligations under the Agreement were only triggered by Zuker's performance. Moreover, the nature of these events (obtaining third party consent from Zuker's associates and implementing bankruptcy plans for several of the Zuker entities) are of the kind over which GECC would have no authority to act.

GECC's argument that the Agreement cannot be read to contain a binding promise to Repay or Restructure because it left some material terms undefined, is equally unconvincing. The Agreement contains a highly specified degree of detail. To the extent that the Restructuring option required documents to be drafted after-the-fact, the terms of the Agreement provided the governing details. [11] That is not to say that every term of the Agreement was spelled out. The missing terms, however, are like those in *Lafayette Place Associates v. Boston Redevelopment Authority,* 427 Mass. 509, 517–518, 694 N.E.2d 820 (1998), a case that is particularly instructive.

> We adhere to the principle that "[a]n agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto," *Rosenfield v. United States Trust Co.,* 290 Mass. 210, 217, 195 N.E. 323 (1935), in the circumstances that justify and gave rise to it: where parties have merely reached the stage of "imperfect negotiation" prior to formalizing a contract, and have not yet reduced their agreement to terms. *Id.* When parties have progressed beyond that stage, however, a competing principle applies: a contract should be interpreted "so as to make it a valid and enforceable undertaking rather than one of no force and effect." *Shayeb v. Holland,* supra at 432, [321 Mass. 429, 73 N.E.2d 731 (1947) ]. See *McMahon v. Monarch Life Ins. Co.,* 345 Mass. 261, 264, 186 N.E.2d 827 (1962). [12] Rules of contract must not preclude parties from binding themselves in

---

**10.** Similarly, under § 8, the Agreement provides that "[i]n the event that both the Restructuring and the Repayment fail to occur in the manner contemplated by this Agreement, each of the Borrowers which have failed to pay their respective Obligations in full as contemplated hereby . . . agrees to pay to GECC . . . an amount equal to any and all reasonable out-of-pocket costs or expenses. . . ."

**11.** Moreover, as Zuker notes, the missing attachments concerned the Restructuring option and not the Repayment option under which he had elected to perform.

**12.** As Judge Leval has said, "Notwithstanding the importance of protecting negotiating parties from involuntary judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation. It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties." (Footnotes ommitted.) *Teachers Ins. Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 497–498 (S.D.N.Y. 1987)

the face of uncertainty. If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding. See generally *Hastings Assocs. v. Local 369 Bldg. Fund, Inc.*, 42 Mass. App.Ct. 162, 169, 675 N.E.2d 403 (1997) (accepting contract calling for appointment of neutral third party to determine lease price under formula); *Cataldo v. Zuckerman*, 20 Mass.App.Ct. 731, 737, 482 N.E.2d 849 (1985) (accepting formula for determination of compensation as sufficiently specific to create contract).

Assuming the truth of the allegations of the Complaint, as we must, the conduct of the parties is also very revealing. If as GECC says, this was a "Plaintiff paid cash, GECC gave time" Agreement, why did it take fourteen single spaced pages to memorialize, when the entire subject of forbearance is disposed of in a page and one-half?[13] And why, if GECC truly believed that all it had given was time, did it feel compelled to obtain Zucker's consent to extend the expiration date to enable its credit committee to meet? And, finally, is it truly to be believed that Zuker would have agreed to dismiss the "multi-million dollar" Shopping Center Litigation as additional consideration for mere forbearance, when he had already agreed to pay $50,000 for GECC's indulgence?

■ The final arrow in GECC's quiver is the argument that the Agreement required only that the internal credit committee review the Repayment option and not that it actually approve it. GECC points out that Zuker admits in the Amended Complaint that the internal credit committee did in fact perform its review and concedes that the committee's rejection was based on its desire to achieve a "better deal" for GECC, a motive which GECC argues cannot as matter law be the basis for a claim of bad faith.

GECC's reading of the Amended Complaint, however, is too narrow. Zuker has sufficiently plead a breach of contract claim and a violation of the covenant of good faith and fair dealing by alleging that GECC lulled him into believing that the credit committee's approval was a mere institutional formality. That assurance is further alleged to have induced his performance of conditions precedent of the Agreement beneficial to GECC, the benefits of which GECC accepted even while knowing that the credit committee had no intention of approving the deal.[14]

### ORDER

For the foregoing reasons, defendant GECC's motion to dismiss is *DENIED*. Zuker is given leave to amend his Amended Complaint within twenty-one days of the date of this Order to conform the factual allegations of the fraudulent misrepresentation claim to the requirements of Fed.R.Civ.P. 9(b).

SO ORDERED.

---

**13.** Notably, the attachments to the Agreement number over ninety pages.

**14.** GECC's argument, made with regard to both the contract claims and the misrepresentation count, that such reliance was unreasonable given that the Agreement clearly states that internal credit committee approval is required, misapprehends GECC's implicit obligation to perform the terms of the Agreement in good faith. *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 707–708, 563 N.E.2d 188 (1990). GECC's final argument that the committee did in fact perform its duties in a timely and fair manner raises factual issues that cannot be resolved in the context of a motion to dismiss.