GINA ALFEO vs. MARK T. DINSMORE & another.[1]

No. 05-P-1678.

Middlesex. October 16, 2006. - February 16, 2007.

Present: KAFKER, GRAHAM, & KATZMANN, JJ.

*Mortgage,* Loan commitment, Real estate. *Contract,* Sale of real estate, Implied covenant of good faith and fair dealing. *Fraud.*

In a civil action arising from a dispute over the return of the plaintiff buyer's deposit under a residential real estate purchase and sale agreement, the judge correctly concluded that the plaintiff had met her obligation under the mortgage contingency clause to "apply for a conventional bank or other institutional mortgage loan," where the plaintiff timely sought financing in a manner that, through application to a single entity (a licensed mortgage lender that "table funded" mortgages by using outside lenders), effectively involved multiple potential lenders of an otherwise suitable nature [253-256], and the defendant sellers could not prevail on their counterclaims of fraud and breach of the covenant of good faith and fair dealing based on the fact that the plaintiff simultaneously was in the process of purchasing another home and seeking mortgage financing for that purchase [256].

CIVIL ACTION commenced in the Superior Court Department on September 22, 2003.

The case was heard by *Wendie I. Gershengorn,* J., on motions for summary judgment.

*Joel A. Kozol* for the defendants.

*Brooke K. Richter* for the plaintiff.

KATZMANN, J. This case, arising from a dispute over the return of the plaintiff buyer's deposit under a residential real estate purchase and sale agreement, centers on whether the plaintiff had met her obligation under the mortgage contingency clause to "apply for a conventional bank or other institutional mortgage loan." A Superior Court judge determined that the plaintiff had

[1]Andrea J. Kozol.

done so. We conclude that the judge was correct as matter of law on the summary judgment record, and also properly rejected various attendant claims.

*Background.* In late 2002, the plaintiff, Gina Alfeo, and her fiancé were looking to purchase a home in Sudbury. On November 22, 2002, the plaintiff entered into a purchase and sale agreement with third parties respecting a home located on Hudson Road in Sudbury (Hudson Road property), with the closing scheduled for January 15, 2003. To finance the purchase, the plaintiff[2] applied for mortgage financing from Drew Mortgage Associates, Inc. (Drew). Drew is licensed in Massachusetts as a mortgage lender and as a mortgage broker, and is also an approved FHA (Federal Housing Administration) loan correspondent. As described in the uncontroverted affidavit of its general counsel, Drew does its business as follows. Drew closes more than 2,000 residential mortgage loans per year, utilizing a mechanism known as "table funding," which is common in the residential mortgage lending industry.[3] Drew takes loan applications from customers, underwrites loans based on Federal National Mortgage Association and mortgage investor guidelines, and makes credit determinations (subject to review and acceptance by the mortgage servicers with whom Drew works). At the time of a mortgage closing, Drew sells the mortgage note and mortgage instrument securing the note to the participating mortgage servicer, simultaneously with the provision of the loan amount by the mortgage servicer.

On December 12, 2002, three weeks after entering the agreement on the Hudson Road property, the plaintiff submitted an offer to purchase a second property, owned by the defendant

---

[2]The plaintiff alone was acting as buyer because she had better credit than her fiancé, a self-employed contractor who had credit issues.

[3]By way of background, we note that table funding has been defined as "a settlement at which a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds." 24 C.F.R. § 3500.2(b) (1997). Typically, in a table-funded transaction, a broker originates and processes mortgage applications for the borrower, and often underwrites the loan. Schneider, A Growing Appetite for Table Funding, Mortgage Banking, Dec. 1992, at 22. The broker then closes the loan in his or her own name but at the time of settlement transfers the loan to a lender who simultaneously advances funds for the loan. Rohan, Real Estate Financing § 4A.05(5)(b)(i) (2006), quoting from 67 Fed. Reg. 49,140 (2002).

sellers, located on Horsepond Road in Sudbury (Horsepond Road property).[4] The plaintiff and her fiancé had decided to purchase both homes, apparently intending to improve and sell the Hudson Road property while living in the Horsepond Road property, but they did not inform the defendant sellers of their intent to purchase or apply for financing for two homes. On December 16, 2002, the plaintiff applied for mortgage financing from Drew for the Horsepond Road property, and Drew issued a preapproval letter for the loan, which was provided to the defendant sellers. The preapproval letter, signed by a Drew vice-president, stated that "we have pre-approved you for a mortgage loan . . . based on a purchase price of $365,000." On December 23, 2002, the plaintiff entered into a purchase and sale agreement with the defendant sellers for the Horsepond Road property for $364,500, paying $18,250 as a total deposit held by the sellers' broker, and setting the closing for January 16, 2003 (one day after the scheduled closing on the Hudson Road property). Paragraph 26 of the purchase and sale agreement contained a mortgage contingency clause, which provides as follows:

> "In order to help finance the acquisition of said premises, the BUYER shall *apply for a conventional bank or other institutional mortgage loan* of $328,500.00 at prevailing rates, terms and conditions. If despite the BUYER's diligent efforts a commitment for such loan cannot be obtained on or before December 31, 2002 the BUYER may terminate this agreement by written notice to the SELLER and/or the Broker(s), as agent(s) for the SELLER, prior to the expiration of such time whereupon any payments made under this agreement shall be forthwith refunded and all obligations of the parties hereto shall cease and this agreement shall be void without recourse by the parties hereto. In no event will the BUYER be deemed to have used diligent efforts to obtain a commitment unless the BUYER submitted a complete mortgage loan application conforming to the foregoing provisions on or before December 23, 2002. *Application to one institutional*

---

[4] A Drew employee had informed the plaintiff and her fiancé that she was likely to obtain financing for both properties.

> *lender shall satisfy Buyer's diligent efforts under this agreement.*"[5]

(Emphases added.)

On December 30, 2002, the defendant sellers were informed that the plaintiff had submitted an application for financing but that more time was needed for it to be processed. The purchase and sale agreement was extended in writing several times to accommodate the plaintiff while her loan application was pending. On January 15, 2003, the plaintiff closed on and took title to the Hudson Road property, for which she paid $285,000, having obtained a mortgage through Drew that was funded by Ohio Savings Bank. The next day, the parties executed a fifth and final extension of the Horsepond Road agreement, extending the time for giving notice of termination for failure to obtain mortgage financing to January 22, 2003, and postponing the closing date to February 4, 2003. On January 22, 2003, after learning that Drew had denied the plaintiff's application for financing, plaintiff's counsel sent a letter timely notifying the defendant sellers that the plaintiff had been unable to obtain financing, and requesting the return of the deposit. The sellers responded by requesting proof of the plaintiff's diligent efforts to obtain financing under paragraph 26. The plaintiff provided the defendants' attorney with a copy of a rejection letter dated January 24, 2003, from Drew's operations manager to the plaintiff, stating that her "loan request . . . was not approved by the Loan Committee of our company" for the reason that the "[r]atio of housing expense to verified income [was] too high." The sellers refused to return the deposit and this action ensued.[6]

The plaintiff brought a complaint seeking a declaration that she was entitled to the return of her deposit on the Horsepond Road property. The defendants filed counterclaims for declara-

---

[5]The purchase and sale agreement was executed using the "Standard Form Purchase and Sale Agreement" (standard form) developed by the Greater Boston Real Estate Board (specifically, the version most recently copyrighted in 1991). The language of the mortgage contingency clause quoted above follows that of the standard form in all material respects except that the final sentence was an addition made by the parties.

[6]Defendant seller Andrea J. Kozol averred that the Horsepond Road property "eventually . . . was sold at a later date and at a lower price than that provided for in the [p]urchase and sale [a]greement."

tory relief and breach of contract, breach of the covenant of good faith and fair dealing, and fraud. On cross motions for summary judgment, the judge allowed the plaintiff's motion and denied the defendants' motion, concluding, among other things, that the plaintiff had made "diligent efforts" to obtain financing because her application to Drew constituted an application to an "institutional lender" under paragraph 26 of the purchase and sale agreement. A final judgment entered, declaring that the plaintiff is entitled to a refund of her deposit and accumulated interest, and dismissing the defendants' counterclaims. The defendants appealed.

*Discussion.* a. *Mortgage contingency clause.* The construction of an unambiguous contract provision is a question of law appropriate for summary judgment. *Seaco Ins. Co.* v. *Barbosa,* 435 Mass. 772, 779 (2002). As with any contract, our aim in interpreting a real estate purchase and sale agreement is to achieve the intent of the parties. See *Shapiro* v. *Grinspoon,* 27 Mass. App. Ct. 596, 600-601 (1989). Our decisions remind us that it is the buyer who is the usual proponent and primary beneficiary of a mortgage contingency clause, which serves as a safety valve when she is unable to obtain financing. See *Tremouliaris* v. *Pina,* 23 Mass. App. Ct. 722, 726 (1987); *Churgin* v. *Hobbie,* 39 Mass. App. Ct. 302, 305 (1995). The clause incidentally benefits the seller by setting a certain date by which the deal may fail or after which the seller knows the buyer is bound to perform. See *ibid.*

The typical clause also protects the seller by requiring that the buyer direct her borrowing efforts toward an appropriate entity engaged in the business of mortgage lending (as opposed to, for example, the proverbial rich uncle or aunt). The clause here thus imposes as its basic requirement that the plaintiff "apply for a conventional bank or other institutional mortgage loan . . . at prevailing rates, terms and conditions" and use "diligent efforts [to obtain] a commitment for such loan." Additionally, in language tacked onto the standard form clause (see note 5, *supra*), the parties specified that "[a]pplication to one institutional lender shall satisfy Buyer's diligent efforts." The evident purpose of this language is to protect the plaintiff from the possibility that "diligent efforts" require multiple applica-

tions for financing. The reasonable reading of the language in its context and in conjunction with the basic requirement above is simply that the plaintiff need only once "apply for a conventional bank or other institutional mortgage loan . . . at prevailing rates, terms and conditions."[7]

The question before us distills to whether, in submitting her application to Drew, the plaintiff in fact "appl[ied] for a conventional bank or other institutional mortgage loan." The defendants argue that Drew is not an "institutional mortgage [lender]" because it does not use its own funds to finance mortgages, but rather table funds them using outside lenders,[8] and that Drew does nothing more than act as a "broker" who brings borrowers and lenders together. We disagree.

First, the very fact that Drew is a licensed mortgage lender under G. L. c. 255E in the Commonwealth, and subject to examination and regulation by the Commissioner of Banks, is supportive of Drew's status as an institutional mortgage lender. Compare *First Fiduciary Corp.* v. *Commissioner of Banks*, 43 Mass. App. Ct. 457, 462-463 (1997) (trust company, which was not engaged in either the "banking functions" of taking deposits or loaning money, was not subject to oversight by Commissioner of Banks). Moreover, many conventional banks, which indisputably are institutional lenders, also use funds from outside sources to fund borrowers' mortgages — for example, those of their depositors.[9] The instantaneous nature of the mechanism by which Drew provides funding should make it no

---

[7]In other words, we construe the words "application to . . . institutional lender" as simply a coextensive cross-reference to the basic requirement that the buyer "apply for a conventional bank or other institutional mortgage loan."

[8]The defendant sellers offer two affidavits, of principals of another lender and of a real estate management company, containing their respective opinions that Drew is not an "institutional lender." Even if this were the controlling point, see discussion, *infra*, the interpretation of the purchase and sale agreement is a matter of law, not a question of fact. See *Lexington Ins. Co.* v. *All Regions Chem. Labs, Inc.*, 419 Mass. 712, 713 (1995); *Sarvis* v. *Cooper*, 40 Mass. App. Ct. 471, 475 (1996). The defendants cannot create an issue of fact by submission of the affidavits containing opinion evidence. To the extent that affidavit evidence offered by the plaintiff similarly contains opinion, we disregard it in our analysis.

[9]In the business of lending, the functions of mortgage financing companies and banks may overlap. See Schroeder, The Law and Regulation of Financial Institutions § 1.01(1) (2006).

less eligible to be considered an institutional mortgage lender than a conventional bank that engages in an effectively similar financing practice.[10] Finally, because Drew processes mortgage applications, underwrites loans, and makes credit determinations in accordance with industry standards, it behaves as a conventional mortgage lender in its decisional processes, and is far more than a simple mortgage broker as the defendants claim.

However, we need not decide specifically that Drew is itself an "institutional mortgage [lender]" for the plaintiff to have met her obligation. Even if Drew is not, it is nonetheless not in dispute that so far as a buyer and seller are concerned, a successful application to Drew is designed to yield, instantaneously at the time of closing when table funding and mortgage transfer to the mortgage servicer occurs, a "conventional bank or other institutional mortgage loan."[11] The application to Drew was therefore an application for precisely such a loan. We cannot reasonably conclude, as the defendants would have us do, that the parties by their contract meant for the plaintiff to forfeit her $18,250 deposit despite having timely sought financing in a manner that, through application to a single entity, effectively involved multiple potential lenders of an otherwise suitable nature. See *Haverhill* v. *George Brox, Inc.*, 47 Mass. App. Ct. 717, 720 (1999) ("Justice, common sense and the probable

---

[10]We also note that the closing failed to occur because the plaintiff did not qualify for the requested loan, not because Drew could not procure funding. And, as the judge noted, the sellers were informed that the plaintiff was pre-approved for the loan and did not complain about the nature of the lender until the loan fell through. Although seller Andrea J. Kozol averred that "[a]t all times prior to my receipt of . . . notice [of termination on January 22], it was represented to me, by the Plaintiff, that she was actively pursuing a commitment for financing from a conventional bank or institutional mortgage lender," Kozol did not contradict expressly the plaintiff's averment that the plaintiff provided notice of Drew's preapproval of the loan. All of the formal extensions are signed on the plaintiff's behalf by her counsel, and not the plaintiff herself. Even assuming that there is enough to create a factual issue whether the plaintiff ever stated that she was applying for bank financing (notwithstanding widespread colloquial acceptance of the term "bank" to refer to the lender, whatever its nature), any such factual issue is still irrelevant if the plaintiff complied with the requirement of diligent efforts, as the judge concluded.

[11]For an example, one need look no further than the plaintiff's mortgage on the Hudson Road property, obtained through Drew and funded by and transferred to Ohio Savings Bank.

intention of the parties are guides to construction of a written instrument"), quoting from *Stop & Shop, Inc.* v. *Ganem*, 347 Mass. 697, 701 (1964). The motion judge was therefore correct in concluding that the plaintiff satisfied her obligations under the mortgage contingency clause.

b. *Counterclaims for fraud and breach of the covenant of good faith and fair dealing.* Quite apart from the institutional lender argument, on the issues of good faith and fair dealing and fraud, the defendant sellers assert that "it was concealed from the [defendants] that [the plaintiff] simultaneously had an agreement to purchase another residence and was actively seeking mortgage financing for that purchase. . . . At no time did [the plaintiff,] or anyone acting on [her] behalf, disclose that she had another home in Sudbury under agreement, or that she was purchasing another home." The contention is that the plaintiff was not acting in good faith because she had no reasonable expectation of obtaining two mortgage loans (and that she could and would have obtained financing for the Horsepond Road property had she not purchased the other property), and that the sellers were harmed by being induced to take their property off the market. On this summary judgment record, however, where the plaintiff applied for one mortgage from Drew, was later pre-approved by Drew for the other mortgage, and was informed by Drew that she was likely to qualify for the mortgages for both homes, the sellers could not demonstrate that the plaintiff was acting unreasonably or in bad faith. We also agree with the judge that in the circumstances, the sellers failed to show that the plaintiff had any affirmative duty to disclose her pending mortgage on the Hudson Road property.[12] The defendants therefore cannot prevail on their counterclaims of fraud and breach of the covenant of good faith and fair dealing.

*Judgment affirmed.*

---

[12]We do not reach the question whether such an affirmative duty could arise in other circumstances not present here.