MCCULLOUGH vs. CHASE GREAT MARSH LLC, MISC 20-000208

































 
 SHEILA MORGAN McCULLOUGH, as Trustee of the 205 Scudder Realty Trust, Plaintiff, v. CHASE GREAT MARSH LLC, Defendant
 MISC 20-000208 
 MAY 7, 2021
BARNSTABLE, ss.
VHAY, J.
DECISION














 Plaintiff Sheila Morgan McCullough, as Trustee of the 205 Scudder Realty Trust (the "Trustee"), seeks specific performance of a contract for the sale of two parcels in Barnstable, Massachusetts. The Trustee entered into a written Purchase and Sale Agreement (the "P&S") with defendant Chase Great Marsh LLC ("Chase") in April 2013. Claiming that the P&S had terminated, and that the Trustee hadn't met her pre-closing obligations anyway, Chase did not appear for a closing scheduled by the Trustee in October 2019. The Trustee asserts that the P&S was alive and well as of October 2019, and that she either had met her pre-closing obligations or had lawfully waived them. 





 The parties have moved and cross-moved for summary judgment on the Trustee's claims, as well as Chase's counterclaim for a declaration that the P&S had terminated. After reviewing the parties' materials and having heard the arguments of counsel, the Court holds that the P&S has not terminated, and the Trustee deserves an order directing Chase to perform its obligations under the P&S. 





 The facts that are material to the parties' motions are undisputed (with one exception, described in note 2 below). The Trustee owns property at 205 Scudder Lane in Barnstable (the "Trust Property"). Abutting the Trust Property to the south is 58 Calves Pasture Lane, owned by Chase (the "Chase Property"). The Chase Property contains a portion of Calves Pasture Lane, a narrow, unpaved private right of way, along its southern edge. 





 In 2013, the Trustee sought to purchase from Chase two parcels of land on the shared northern boundary of the Chase Property (the "Sales Parcels"). The Sales Parcels are on registered land. The parties hired a surveyor to prepare a plan depicting the Sales Parcels (the "Original Plan") and eventually signed the P&S. The Original Plan is attached to the P&S. Paragraph 2 of the P&S refers to the Original Plan only as a way of describing the Sales Parcels: "[t]he land marked on the plan attached as Parcel 1 and Parcel 2, respectively, comprising approximately .925 acres in total . . . ." 





 The P&S contains several contingencies. The chief ones are listed in ¶ 29 of the P&S, which states: 





 The Parties understand that [the Trustee] is purchasing the [Sales Parcels] in connection with [the Trustee's] efforts to obtain favorable action by or permits and approvals from such municipal or other authorities in order to allow the construction of a new and additional residential structure on [the Trustee's] adjacent property, with conditions if any satisfactory to [the Trustee]. The Parties therefore agree that in all events [the Trustee's] obligations hereunder are contingent upon [the Trustee] obtaining, at [the Trustee's] expense, all of the following: 





 As to Parcel 1: 





 (i) Completion of survey plan which identifies Parcel 1 conforming to Land Court requirements[;] 





 (ii) Submission to and approval of Land Court of this plan; 





 (iii) Acceptance by Land Court of a deed conveying Parcel 1;





 (iv) Approval by Land Court of deregistration of Parcel 1; and 





 (v) Exhaustion of all appeals with respect to any of the foregoing, or expiration of applicable appeal period without any appeal having been filed, such that the actions are final, valid and in full force and effect without possibility of further valid legal contest. 





 As to Parcel 2: 





 (i) Completion of survey plan which identifies Parcel 2 conforming to Land Court requirements[;] 





 (ii) Favorable action or decisions by the Barnstable Planning Board, Board of Appeals, Building Department, and any other municipal authority hav[ing] jurisdiction, which would allow the construction of the new and additional residential structure upon [the Trustee's] land following the conveyance to [the Trustee] of the [Sales Parcels;] 





 (iii) Submission to and approval of Land Court of the above plan; 





 (iv) Acceptance by Land Court of a deed conveying Parcel 2; 





 (v) Approval by Land Court of deregistration of Parcel 2; and 





 (vi) Exhaustion of all appeals with respect to any of the foregoing, or expiration of applicable appeal period without any appeal having been filed, such that the actions are final, valid and in full force and effect without possibility of further valid legal contest. 





Paragraph 29 further provides: 





 In the event that [the Trustee] is unable to obtain all of the foregoing, or [the Trustee] determines that further pursuit of any such approval is impracticable, then [the Trustee] may terminate this Agreement by written notice to [Chase], in which event all obligations of either party to the other shall cease, the deposit shall be returned to [the Trustee], and this Agreement shall be declared null and void without recourse by either party to the other. 





 Paragraph 8 of the P&S ties the closings under the P&S to ¶ 29's contingencies: 





 The deed for Parcel 1 is to be delivered at a mutually convenient date and time, no later than 30 days after the last to occur of the Parcel 1 contingency events set forth in Paragraph 29, at the Barnstable County Registry of Deeds, or at [the Trustee's] option, at the office of [the Trustee's] counsel, unless otherwise agreed upon in writing. The deed for Parcel 2 is to be delivered at a mutually convenient date and time, no later than 30 days after the last to occur of the Parcel 2 contingency events set forth in Paragraph 29, at the Barnstable County Registry of Deeds, or at [the Trustee's] option, at the office of [the Trustee's] counsel, unless otherwise agreed upon in writing. It is agreed that time is of the essence of this agreement. 





Paragraph 30 of the P&S describes Chase's further obligations with respect to the ¶ 29 contingencies: 





 [Chase] agrees to support and join in, and not directly or indirectly to contest, object to or seek to impede [the Trustee's efforts], to obtain the actin and approvals relating to the PREMISES as described herein. [Chase] agrees that [the Trustee] may apply for and pursue the obtaining of any such decision, permit or approval, in its own name or as agent for [Chase], or both, as the case may be, and agrees at [the Trustee's] request, to join in and execute any permit applications or other submissions required in connection therewith, provided that [Chase] in doing so will not be required to incur any expense. 





 The Original Plan labels Parcel 1 and Parcel 2. The notes beneath the label for Parcel 1 read: 





Chase to Thompson [Note 1] 





15,703 SF (Includes Esmnt A) 





(For Conveyance Purposes, 





Not a Separate Building Lot) 





(To be Combined with Lot B) 





Lot B on the Original Plan has these notes beneath its label (asterisks in original): 





112,105± SF or 2.6 Ac. 





To MLW 





Upland = 77,599± or 1.67 Ac. 





Wetland = 32,822± or 0.8 Ac. 





Shape**=21.1 





Note: 2.0 Ac. Upland Total When Combined with PCL 1 





Similar notes appear on the Original Plan for Parcel 1 and an abutting lot, Lot A. 





 In June 2015, the Trustee and Chase amended the P&S (the "Amendment"). Through the Amendment, Chase added to the definition of "Sales Parcels" an access easement over Calves Pasture Lane. The easement crossed the Chase Property as well as a parcel owned by Judith S.H. Chase and Francis F. Chase, Jr. The Amendment calls the latter parcel (also registered land) the "Right of Way Parcel." In the Amendment, Chase promised, "[p]rior to the time of performance" under the P&S, to exercise "reasonable efforts" to buy the Right of Way Parcel from Judith and Francis Chase. The Amendment further states that, "in exercising such reasonable efforts [Chase] shall not be required to make any monetary payments to [Judith and Francis] beyond payments already made to them." 





 The Amendment recognized that, for Chase to complete its promised purchase of the Right of Way Parcel, Chase would need a new certificate of title from the Land Court. In keeping with Chase's stated desire in the Amendment not to be further out of pocket, the Trustee agreed to exercise reasonable efforts to obtain that new certificate, "at the [Trustee's] sole cost and expense . . . ." The parties further agreed in the Amendment that, as amended, the P&S "is in full force and effect." 





 Following execution of the Amendment, the Trustee filed in August 2015 a "subsequent" or "S-Petition" case with the Land Court, in Chase's name. See Chase Great Marsh, LLC, Land Court No. 15 SBQ 20950 08-001 (the "S Case"). Chase's petition asserted that Judith and Francis Chase had conveyed to Chase the Right of Way Parcel. Chase thus asked this Court to issue to Chase a certificate of title for the Right of Way Parcel. The Trustee filed the S Case at the Trustee's expense. 





 Around the time it filed the S Case, the Trustee applied to the Barnstable Zoning Board of Appeals (the "Board"), as ¶ 29 of the amended P&S contemplated, for modification of two variances that restricted development of the Trust Property (the "Modifications"). The Board discussed the Trustee's application at an August 26, 2015 meeting. The Board hinted that it likely wouldn't grant the application unless Calves Pasture Lane were paved and expanded by four feet. That didn't sit well with the Trustee. In October 2015, the Trustee informed Chase that the Trustee wasn't interested in disrupting the "natural rural quality" of the Lane; instead, the Trustee would withdraw her application for the Modifications and move forward with acquiring the easement from Chase as "delineated on [the] map and in [the] agreement." 





 At that point, Chase began to have cold feet. On October 26, 2015, Chase wrote it was "not willing to proceed with the sale of the property. . . . [T]oo much has changed since the original intent and purpose of the sale." The Trustee didn't concur. Instead, in November 2015, the Trustee proposed that the parties meet with an engineer. The Trustee suggested the engineer could "redraw the plan" and help the attorneys negotiate "a contract revision." 





 The Trustee and Chase met with an engineer multiple times in late fall of 2015. On December 3, 2015, however, counsel for Chase emailed counsel for the Trustee. Chase's counsel asserted that the parties had a conversation in which they "agreed to terminate the existing purchase and sale agreement and enter into a new one changing the area that is going to be sold." The alleged conversation occurred with former Trustee Thompson, now deceased. [Note 2] Counsel for the Trustee responded that same day: "I am reaching out to my client on this. Why wouldn't we simply amend the existing purchase and sale agreement, to change the property description?" Chase's counsel replied, "I am open to that." 





 After the exchanges described in the preceding paragraph, the parties' communications for nearly the next two years were limited largely to updates on the status of the S Case and work revising the Original Plan. The one exception was an exchange in February 2017, immediately following Trustee Thompson's death. Chase informed Trustee McCullough "the original P&S is not still usable." The Trustee responded that her "mother's passing did not terminate the [P&S], and the [P&S] remains enforceable." Chase didn't immediately reply. 





 In November 2017, this Court (Piper, J.) approved in the S Case the issuance to Chase of a certificate of title for the Right of Way Parcel. The parties continued thereafter to negotiate over changes to the Original Plan. The Trustee appears to have abandoned those efforts in early 2019. Instead, the Trustee moved forward with completing various remaining contingencies under ¶ 29. In March 2019, the Trustee had a surveyor prepare a new plan identifying the Sales Parcels (the "Final Plan"). As ¶ 29 contemplates, someone needed to submit to the Court's survey department a plan like the Final Plan so that the Court could approve a description of the Sales Parcels in whatever deed was to convey them. In April 2019, Chase confirmed that the Final Plan looked "fine," and the Trustee submitted the Final Plan to this Court for approval. The Trustee's application for approval of the Plan included a January 2019 letter from Chase stating it was permitting the Trustee's surveyor to file a "division plan creating two small conveyance parcels at the [Chase Property]." This Court approved the Final Plan on June 17, 2019. The Court's survey department later approved, on August 28, 2019, the description of the Sales Parcels contained in the Trustee's draft of a proposed deed conveying the Parcels. 





 On September 4, 2019, the Trustee contacted Chase and asserted that she had either satisfied or waived "all of [the] Buyer contingencies" in the amended P&S. The Trustee informed Chase that she was prepared to close on the sale of the Sales Parcels on October 4, 2019. The Trustee provided to Chase, by certified mail and first-class mail, written notice of the closing. The Trustee appeared at the closing with cashier's checks for the balance of the purchase price. But Chase didn't show up.





 That ends the undisputed facts. The Court now turns to the general principles that govern this case. Contracts for the sale of real estate in Massachusetts are subject to the Statute of Frauds, G.L. c. 259, § 1. The Statute requires such contracts to be in a writing signed by the party against whom enforcement is sought. Further, for such contracts to be binding, the parties must (1) intend to be bound and (2) the agreement must include both (a) an adequate description of the property to be sold and (b) the agreed price. See McCarthy v. Tobin, 429 Mass. 84 , 86 (1999). If a party without legal excuse breaches an enforceable real-estate sales contract, the other party may seek performance of the contract if the non-breaching party can show it was ready, willing, and able to proceed with performance at the agreed time of closing. See Lafayette Place Assocs. v. Bos. Redevelopment Auth., 427 Mass. 509 , 519 (1998). Appearance at a scheduled closing with checks in hand is sufficient evidence of being ready, willing, and able to close. See Bucciero v. Drinkwater, 13 Mass. App. Ct. 551 , 552-556 (1982). Finally, on order directing a seller to perform his or her obligation to sell a specific piece of property is an appropriate remedy for breach of a real-estate sales contract. See Raynor v. Russell, 353 Mass. 366 , 367 (1967). 





 The amended P&S meets the requirements of Statute of Frauds, and neither party questions its initial intent to be bound by the amended P&S. The Original Plan depicts the two properties to be sold (the Sales Parcels), and the amended P&S lists the agreed price for each parcel. The Trustee scheduled a closing with Chase in accordance with the terms of the amended P&S, and it's undisputed that the Trustee brought to the closing sufficient funds. 





 Given the undisputed facts, the Trustee is entitled to specific performance of the amended P&S, unless Chase has a lawful excuse for skipping the October 2019 closing and not performing. Chase offers four such excuses. First, Chase asserts that the Trustee did not meet her alleged obligation under ¶ 29 of the P&S, with respect to Parcel 2, to make reasonable efforts to obtain the Modifications. Second, Chase argues that because the Trustee never obtained the Modifications, the amended P&S terminated on account of frustration of its purpose. Third, Chase contends that the amended P&S has expired. Fourth, Chase insists that the parties terminated the amended P&S (a) at the time of Chase's October 2015 email that "we are not willing to proceed with the sale of the property"; (b) as a result of Chase and the Trustee's December 2015 exchange regarding terminating the P&S and "work[ing] towards a new agreement"; and/or (c) on account of the parties' December 2015 meetings with an engineer and their efforts over the next four years to reach a new agreement. The Court addresses Chase's arguments in that order. 





 Alleged Breach of Obligation to Pursue the Modifications. Chase admits that the plain language of ¶ 29 of the P&S does not obligate the Trustee to obtain "favorable action" on her request for the Modifications. Chase nevertheless asserts that "permitting" contingency clauses such as ¶ 29 obligate the buyer to use reasonable efforts to obtain favorable action, citing Stabile v. McCarthy, 336 Mass. 399 (1957); and Sechrest v. Safiol, 383 Mass. 568 (1981). Chase further contends that (a) the Trustee prematurely and unreasonably abandoned her efforts to obtain the Modifications; (b) she thus failed to perform as required under the P&S; and thus (c) Chase is excused from conveying the Sales Parcels. 





 While Stabile and Sechrest contain language that supports Chase's argument, neither case stands for the proposition Chase advances here. Both cases involved purchase and sale agreements that, like the P&S here, had permitting-contingency clauses. Those clauses allowed the buyer to terminate the agreement and obtain return of his deposit if he were "unable" to obtain specified permits (see Stabile, 336 Mass. at 401) or had "not obtained" such permits (see Sechrest, 383 Mass. at 569). In each case, the buyer sought to terminate the agreement and obtain return of his deposit after he decided to suspend permitting efforts. In both cases, the sellers agreed the buyers could terminate the agreement, but the sellers insisted that they needn't return the buyers' deposits: a refund depended on the buyers having made reasonable efforts to obtain the specified permits. See Stabile, 336 Mass. at 402; Sechrest, 383 Mass. at 570. The courts in both cases agreed with the sellers, and as the buyers in both cases hadn't proven they'd made reasonable efforts to get their permits, the courts upheld the sellers' refusals to return the buyers' deposits. See Stabile, 336 Mass. at 403-404; Sechrest, 383 Mass. at 571. 





 The trouble with Chase's argument is that both Stabile and Sechrest dealt with whether a buyer could invoke a permitting contingency both to terminate a real-estate purchase and sale agreement and obtain a refund of the buyer's deposit. See Stabile, 336 Mass. at 403; Sechrest, 383 Mass. at 572. Neither case holds that the buyer must exercise reasonable efforts under a permitting contingency before waiving that contingency and continuing performance of the parties' agreement (as opposed to terminating it). Chase also hasn't brought to the Court's attention, nor has the Court found, any case in which a court has extended Stabile or Sechrest to a buyer's decision to waive a permitting contingency. The Trustee thus has no obligation under Massachusetts law to use reasonable efforts to obtain the Modifications before opting to waive ¶ 29's corresponding permitting contingency. 





 Frustration of Purpose. A performance-excusing frustration of the purpose of a contract occurs when, "after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made . . . ." Restatement (Second) of Contracts § 265 (1981) (the "Restatement"). Under Massachusetts law, a party claiming frustration of purpose must show that (1) the allegedly frustrated purpose is a principal purpose of the contract; (2) the frustration is substantial; and (3) the parties to the contract did not anticipate the occurrence of the frustrating event. See Chase Precast Corp. v. John J. Paonessa Co., 409 Mass. 371 , 375 (1991), citing Restatement at § 265. The summary-judgment record shows that Chase can't prove Chase Precast's first and third elements, and hence Chase's frustration of purpose argument fails. 





 deFreitas v. Cote, 342 Mass. 474 , 477 (1961), supplies a simple method of gleaning the primary purpose of a real-estate purchase and sale agreement (emphasis added): 





 The essence of the agreement of sale, in the present case, is contained in the language found in the first sentence of the agreement, "the sellers . . . agree to sell, and the buyer . . . agrees to buy the above mentioned property . . . ." This is the true purpose and intent of the parties in entering into this purchase and sale agreement. 





 The opening sentence of the amended P&S is substantially the same as in deFreitas: "SELLER[] agrees to SELL . . . and BUYER . . . agrees to BUY . . . [t]he land marked on the plan attached as Parcel 1 and Parcel 2 . . . ." Chase tries to sidestep this language by pointing to ¶ 29 of the P&S plus the Original Plan, particularly its parenthetical comments under the labels of the Sales Parcels and Lots A and B. Chase contends that ¶ 29 and the Original Plan show that a principal purpose of the amended P&S was to join the Sales Parcels with the existing Trust Property and further subdivide them -- an objective that the Trustee appears to have abandoned. Chase argues that the Trustee's decision to drop the combine-and-subdivide effort frustrates the P&S's principal purpose. 





 Chase's argument collides with the language of the amended P&S and another holding in deFreitas. The amended P&S contains nothing that suggests that combining and subdividing the Sales Parcels and the Trust Property was a mutual objective of the parties. Instead, every objective identified in ¶ 29 of the amended P&S is described as belonging to the Trustee: it is the Trustee that "is purchasing the [Sales Parcels] in connection with [the Trustee's] efforts to obtain favorable action . . . from such municipal or other authorities in order to allow the construction of a new and additional residential structure on [the Trustee's] adjacent property, with conditions if any satisfactory to [the Trustee]." The parties agreed that "in all events [the Trustee's] obligations hereunder are contingent upon [the Trustee] obtaining, at [the Trustee's] expense," the ¶ 29 contingencies. Chase's only role in connection with ¶ 29 was (a) to "support and join in, and not directly or indirectly to contest, object to or seek to impede," the Trustee's efforts (but only if "in so doing [Chase] will not be required to incur any expense," P&S at ¶ 30); and (b) to terminate the P&S and return the Trustee's deposit if the Trustee were unable to obtain the ¶ 29 contingencies. 





 The objective of ¶ 29 of the P&S is like that of the condition described in deFreitas. There, in connection with a residential purchase and sale agreement, the parties agreed to this clause: "This sale is subject to a G.I. Loan and in the event that said amount is not approved, the deposit will be returned in full . . . ." deFreitas, 342 Mass. at 477. The deFreitas agreement also provided: "[S]hould the G. I. appraisal be less than requested and should the sellers refuse to sell for the amount of said appraisal, then this contract becomes null and void . . ." Id. The G.I. appraisal came in low, and the buyer never received the G.I. loan. The buyer nevertheless was able to obtain other financing that enabled him to tender the agreed purchase price. The sellers nevertheless refused to perform her obligations, and the buyer sued for damages. Id. at 475-476. 





 The deFreitas trial judge instructed the jury "that if the G.I. loan was not obtained and the appraisal was less than the amount requested and the figure mentioned in the appraisal was not accepted by the defendants the agreement of sale 'became null and void and of no effect,'" and the buyer could not recover under it. Id. at 477-478. The Supreme Judicial Court held that the instruction was erroneous. The court characterized the "essence" of the parties' agreement as one for the purchase and sale of real estate. The G.I. Loan clause, by contrast, "was a condition inserted in the contract for the benefit of the buyer . . . . It would be of no importance to the [seller] whether the buyer was offered a G.I. loan if the buyer was still able to tender the full purchase price." Id. at 477. The deFreitas Court similarly characterized the appraisal clause as "surplusage," as the buyer never offered to the sellers less than the contract price. Id. The court sustained the buyer's objections to the jury charge, and held that the two clauses did not limit the buyer from raising "the necessary consideration" from other sources and insisting on the sellers' performance. Id. at 478 and 476 n.1. 





 The Court thus concludes, consistent with deFreitas, that (a) the primary purpose of the amended P&S is the purchase and sale of the Sales Parcels, and (b) obtaining the Modifications is not a primary purpose of the amended P&S. Even if it were, Chase isn't able to prove Chase Precast's third element for establishing frustration of purpose: that the parties didn't anticipate the frustrating circumstance, or that it "has made performance vitally different from what was reasonably to be expected." Chase Precast, 409 Mass. at 374, quoting Lloyd v. Murphy, 25 Cal. 2d 48, 54 (1944). The parties addressed in ¶ 29 of the P&S what would happen in the event the Trustee didn't obtain satisfactory zoning approvals. If Chase wanted an additional result - say, its own power to terminate the P&S in the event approvals weren't granted - Chase shouldn't have agreed to the text found in ¶ 29. A court may not reform a contract merely because a party failed to negotiate language favorable to that party. See, for example, Ward v. Ward, 70 Mass. App. Ct. 366 , 369 (2007). Chase thus can't prove that the doctrine of frustration of purpose excuses Chase from performing its obligations under the amended P&S. 





 Expiration of the P&S and/or the Trustee's power to waive contingencies. The amended P&S doesn't provide an outside date for a closing. The P&S likewise contains no date by which the Trustee was to obtain or waive the P&S's stated contingencies. The P&S's only directions regarding time are that (a) each Sales Parcel deed is "to be delivered at a mutually convenient date and time, no later than 30 days after the last to occur of [each Sales Parcel's] contingency events set forth in Paragraph 29"; and (b) "time is of the essence." 





 Under Massachusetts law, when an agreement includes no outside time for performance, performance must be made within a reasonable time. "Determining what is a reasonable time [for performance] involves examining 'the nature of the contract, the probable intention of the parties, and the attendant circumstances.'" Lorenzo-Martinez v. Safety Ins. Co., 58 Mass. App. Ct. 359 (2003), quoting Plymouth Port. Inc. v. Smith, 26 Mass. App. Ct. 572 , 575 (1988). And in the case of contracts that contain open-ended contingency clauses, the court must examine the parties' obligations and expectations based on the work the parties anticipated would be needed to achieve each contingency. See Radley v. Johnson, 25 Mass. App. Ct. 969 , 971 (1988) (buyer's 26-month delay in waiving a zoning contingency not unreasonable where an amendment to the parties' purchase and sale agreement provided for monthly credits to seller and other consideration; buyer's deposit secured 25 months of payments). 





 Chase points to several milestones as demonstrating that the Trustee waited unreasonably long to waive ¶ 29 and to close on the Sales Parcels. Chase first argues that the Trustee waited unreasonably long (two years after execution of the P&S) before first seeking the Modifications in August 2015. That argument may have had force as the parties approached the summer of 2015, but in June 2015, they both signed the Amendment. The Amendment states that the P&S remained "in full force and effect," and it authorized the Trustee's prosecution of the S Case. If Chase thought by the summer of 2015 that the Trustee had unreasonably delayed seeking the Modifications, Chase shouldn't have agreed to the Amendment. 





 The Court likewise disregards the period between execution of the Amendment and the completion of the S Case. The Amendment required the Trustee to "exercise reasonable efforts to obtain . . . at the Buyer's sole cost and expense" a certificate of title that put the Right of Way Parcel in Chase's name, so that Chase could grant the Trustee an easement over the Parcel. The Trustee filed the S Case in August 2015. A final order didn't enter in the S Case until November 2017. Chase has pointed to nothing in the Trustee's handling of the S Case that suggests that the Trustee took too long with it. 





 Chase's case for unreasonable delay of the closing, or in the Trustee exercising her right to waive ¶ 29's contingencies, thus depends on what happened between the end of the S Case in November 2017 and September 2019, when the Trustee formally waived the remaining ¶ 29 contingencies and told Chase the closing would be in October 2019. It's undisputed that during that period, the parties "engaged in numerous conversations . . . regarding possible alternative solutions to the issues that had," in the words of Chase's counsel, "prevented the original P&S from being performed." Affidavit of John T. McLaughlin, Esq., ¶¶ 9-12. It's also undisputed that first in January 2019, and again in April 2019, consistent with its obligations under ¶ 29, Chase assented to the Trustee's preparation of the Final Plan and her submission of that Plan to this Court for approval. It's undisputed that this Court's approval of the Final Plan and the parties' proposed deed (agreed contingencies described in ¶ 29) didn't occur until August 2019. The following month, the Trustee waived the outstanding ¶ 29 contingencies and requested an October 2019 closing.





 Chase doesn't identify any act or omission by the Trustee between November 2017 and the closing date that demonstrates that (or even creates a triable issue concerning whether) the Trustee acted unreasonably. See Radley, 25 Mass. App. Ct. at 971 (to defeat buyer's motion for summary judgment under a purchase and sale agreement, seller who claims untimely waiver of contingency must provide specific facts showing buyer's unreasonable conduct). The Court thus holds that Chase can't demonstrate that the Trustee unreasonably delayed waiving her contingencies under ¶ 29 of the amended P&S, or that she unreasonably delayed the closing. 





 Termination of the amended P&S. Chase argues that three events resulted in termination of the amended P&S: (1) Chase's written notice to the Trustee on October 26, 2015, that Chase was "not willing to proceed with the sale of the property"; (2) Randall Chase, Jr.'s alleged December 2015 conversation with deceased Trustee Thompson; and (3) the parties' negotiations from December 2015 through early 2019 over (in the Trustee's eyes) a revised or (in Chase's eyes) a new contract. None of Chase's termination arguments succeeds. 





 The amended P&S contains two, and only two, termination provisions. The first is in ¶ 27, which states: "This instrument . . . may be cancelled, modified or amended only by a written instrument executed by both [Chase] and the [Trustee]." It's undisputed that the Trustee didn't sign Chase's October 26, 2015 notice. It's also undisputed that Mr. Chase's alleged conversation with Trustee Thompson didn't result in a written, co-signed termination instrument, and neither did the parties' negotiations between December 2015 and early 2019. So none of Chase's three claimed termination events caused termination under ¶ 27 of the amended P&S. 





 The second termination provision is in ¶ 29. The trouble with ¶ 29 is that it gives only the Trustee the power to "terminate this agreement by written notice" to Chase. "We must put ourselves in the place of the parties to the instrument and give its words their plain and ordinary meaning in the light of the circumstances and in view of the subject matter." deFreitas, 342 Mass. at 477, quoting McQuade v. Springfield Safe Deposit & Trust Co., 333 Mass. 229 , 233 (1955). As noted earlier, the parties included ¶ 29 for the Trustee's benefit, and not Chase's. [Note 3] Chase thus enjoyed no power under the amended P&S to terminate it unilaterally by written notice, as the October 26, 2015 notice attempted to do. Mr. Chase's alleged discussion with Trustee Thompson, and the parties' subsequent negotiations, likewise didn't result in a written notice to Chase, from either of the Trustees, stating they were terminating the P&S. 





 Focusing more specifically on Mr. Chase's alleged conversation with Trustee Thompson, Chase argues that, notwithstanding ¶ 27 of the amended P&S, parties may, by oral communications, mutually terminate a written real-estate purchase and sale agreement. Chase primarily cites Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432 (1992), for that proposition. Cambridgeport indeed holds that parties may orally modify non-material terms of a contract (such as time and mode of performance), even if their contract contains a clause like ¶ 27 that says that all changes are to be in writing. See id. at 439; see also McKinley Invs., Inc. v. Middleborough Land, L.L.C., 62 Mass. App. Ct. 616 , 619 (2004) (applying Cambridgeport to written real-estate purchase and sale agreement). But Chase offers no case that has extended the Cambridgeport doctrine to a provision that requires written termination of the parties' agreement. Chase also doesn't offer any reason why this Court should be the first to extend Cambridgeport to written-termination clauses. 





 Even if this Court were inclined to extend Cambridgeport in the manner Chase urges, Chase faces a second hurdle. Cambridgeport holds that, to be enforceable, an oral modification of a contract must be "of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties." Cambridgeport, 413 Mass at 439 n. 10. Sea Breeze Estates, LLC v. Jarema, 94 Mass. App. Ct. 210 (2018), sharpens the analysis, requiring the party who asserts "that an oral modification occurred [to] present evidence that the parties reached an agreement as to its terms," id. at 217, and that the oral contract, "'like any other,'" was the product of "'an offer, acceptance, and consideration.'" Id., quoting Vasconcellos v. Arbella Mut. Ins. Co., 67 Mass. App. Ct. 277 , 280 (2006). 





 While Chase has presented disputed evidence of an offer from Mr. Chase ("Let's terminate the P&S."), and disputed evidence of Trustee Thompson's acceptance, Chase provides no evidence that Chase furnished any consideration to the Trustee for her alleged assent to terminate the P&S. Chase has offered no evidence of a payment to the Trustee, nor has Chase pointed to any proof that it excused the Trustee from further performance of her duties under the amended P&S (for example, her duty to prosecute at her sole expense the ongoing S Case, which she continued to do for nearly two years). The Court thus rejects Chase's argument that Mr. Chase's conversation with Trustee Thompson resulted in an enforceable agreement to terminate the amended P&S. 





 Chase's third termination argument - that by negotiating over a new agreement, the parties mutually agreed to terminate their old one - also fails. Whether they were starting over with a new contract, as Chase asserts, or merely working on a modification, as the Trustee claims, it's undisputed that the parties never reached a second agreement. Taking the summary-judgment record in Chase's favor, the evidence of the parties' negotiations from December 2015 to early 2019 demonstrates, at most, the Trustee's willingness to compromise, and not an agreement to terminate the amended P&S. See, for example, Radley, 25 Mass. App. Ct. at 971 (buyer's offers to modify P&S's payment terms, two years after parties executed P&S, and in face of seller's claims that the P&S had terminated, did not constitute a repudiation of P&S by buyer). "It is axiomatic that 'expectations and negotiations fall far short of a binding agreement,'" even if the alleged new agreement merely is one to terminate an earlier contract. Sea Breeze Estates, 94 Mass. App. Ct. at 215-216, quoting Brighton Packing Co. v. Butchers' Slaughtering & Melting Ass'n, 211 Mass. 398 , 405 (1912). 





 For these reasons, the Court GRANTS the Trustee's motion for summary judgment and DENIES Chase's cross-motion for summary judgment. Judgment to enter accordingly. 





FOOTNOTES
[Note 1] Thompson is the last name of a former, now-deceased, co-trustee of the 205 Scudder Realty Trust, Jane McCullough Thompson. Ms. Thompson was Trustee McCullough's mother. 

[Note 2] In opposition to the Trustee's motion for summary judgment, and in support of its cross-motion for summary judgment, Chase has submitted the Affidavit of Randall Chase, Jr. Mr. Chase states in his affidavit that "[i]n a discussion that Jane and I had in December 2015, we agreed that the P&S was terminated, and we also agreed to work towards a new agreement." The Trustee disputes Mr. Chase's version of the discussion, but for purposes of the Trustee's motion for summary judgment, the Court must accept Mr. Chase's account of the conversation. 

[Note 3] Chase argues that Alfeo v. Dinsmore, 68 Mass. App. Ct. 249 (2007), holds that contingency clauses benefit both buyer and seller. Alfeo concerned a mortgage contingency clause in a residential real-estate purchase and sale agreement. The Alfeo court observed that such a clause "incidentally benefits the seller by setting a certain date by which the deal may fail or after which the seller knows the buyer is bound to perform." Id. at 253. No such "certain date" for performance appears in ¶ 29 of the amended P&S. Even if there were such a date in ¶ 29, nowhere does Alfeo hold that the seller implicitly enjoys the same benefits under a contingency clause that are expressly granted to the buyer. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.